**LUDENA v. THE SANTA LUISA.**

United States District Court
S. D. New York.
Feb. 24, 1953.

Harry D. Graham, New York City, for libelant.

Kirlin, Campbell & Keating, New York City (Raymond Parmer, New York City, of counsel), for claimant.

LEIBELL, District Judge.

This is an action in rem against the steamship Santa Luisa. The libel was filed September 9, 1949, and contains two causes of action. The Grace Line, Inc., as the owner of the vessel and the claimant herein, filed an answer to the libel on October 18, 1949. Libelant was a passenger on the vessel bound from Callao, Peru, for New York. She purchased her ticket (Ex. A) and boarded the vessel on March 7, 1949. She was injured aboard ship about 7:30 p. m. March 15th. Paragraph Third of the libel alleges:

"* * * On or about March 14th, 1949, while transitting the Panama Canal, the weather was warm and the stewardess in attendance opened the libellant's door, leaving the same unhooked, or unsecured, without any warning or knowledge to the libellant, and then drew the curtain across said doorway. At about 07:30 P. M. of said day, the libellant was leaving her cabin to go to the salon for dinner, the vessel then having transitted the Canal and being upon the sea, when the aforesaid door suddenly slammed with a lurch of the vessel, throwing the libellant against the passageway bulkhead and closing upon her fingers of her right hand."

Paragraph Fourth describes her injuries as follows:

"Fourth: That as a result of the occurrences aforementioned, the libellant sustained severe lacerations and a compound fracture of the right index finger, a severe laceration of the left heal [sic] and a large hematoma of the left buttock accompanied by shock."

Libelant charges that the accident happened "solely by reason of the unseaworthiness of the Santa Luisa, as aforesaid and the negligence and incompetency of the aforesaid stewardess". She claims damages of $25,000 under the first cause of action.

A second cause of action claims damages of $10,000, based on the alleged negligence of the ship's doctor who treated her. Paragraph Seventh alleges:

"Seventh: That upon being injured as aforesaid, the libellant was taken to the vessel's doctor who sewed the tip of her finger back and set the bones of said finger in such negligent manner as to require the same to be re-broken upon arrival at New York and re-set, thereby aggravating the libellant's injuries and causing her to suffer additional intense pain and agony."

The answer, in addition to denials, pleads as a defense that libelant's injuries were caused in whole or in part by her own negligence, and that the injuries she received arose out of certain obvious risks, dangers and hazards which had been assumed by her.

At the trial the libelant gave several contradictory explanations of how the accident happened. The above quoted statement from paragraph Third of the libel was completely disproved. The doorway to her room did not have any curtain. The vessel was air conditioned. Her room had a metal door, and if anyone had wished to have the door held partly opened for any purpose [1] there was a hook and eye at the upper part of the door and frame, the hook being on the framework and the eye on the door. (See photograph, Ex. 1.) Further, the accident happened to the libelant after she had been in her room to "freshen up" for dinner and she was on her way out to go to the dining room when she was injured. She would not be likely to

[1]. The temperature outside that afternoon ranged from 72° to 79°. There was a moderate to fresh breeze.

have the door of her stateroom wide open while getting ready for dinner. Finally, the door could not have "suddenly slammed with a lurch of the vessel" because if the door had been fully opened so that the spring and plug fastener on the inside had snapped into position, no lurching of the vessel would have loosened the door from its catch. A photograph (Ex. 1) shows the door held back against a partition from which a plug extended, which would snap into an omega shaped appliance at the top of the inside of the door. It should also be noted that the accident happened on March 15th, when the ship was 20 hours out from Cristobal, not on the 14th soon after the vessel had passed through the canal. The whole story of the negligence of the stewardess as alleged in paragraph Third of the libel has no foundation in fact. (At the trial the libel was amended to charge a steward, not a stewardess, with the alleged negligence.)

The story which libelant finally told, towards the end of her cross-examination, was that while she was going out the door of her stateroom a roll of the ship flung her out and across the passageway outside her room and up against the partition on the other side of the passageway (See photograph, Ex. 1); that she struck that partition with her left hand and hip; that then a roll of the ship in the opposite direction sent her back into her room again; that she then grasped the edge of the door of her room, which was opened back against the wall; and that another roll of the ship sent her back again into the passageway and as she held onto the edge of the door it closed upon her fingers.

The injuries report signed by the ship's doctor says nothing about any injury to her hip or heel.

Dr. Farley whom she visited on the evening the vessel arrived in New York (March 21st) did not testify to any heel or hip injury.. When she was examined by Dr. Balensweig, the respondent's doctor, on September 23, 1949, she claimed that she had "suffered injuries to her upper right arm in addition to the right middle finger, the left hip and the left ankle." .Dr. Balensweig reported that "there are no objective findings relative to these parts of her anatomy except for the right middle finger".

A steward testified that he saw libelant catch her fingers in the door; that she was opening the door, with her left hand on the knob, and was snapping the lock with her right hand on the button, when the ship rolled to starboard and she and the door pushed inside the room; that the ship then rolled to port and the door slammed on her hand. The steward went to her assistance and got the ship's doctor.

The Captain testified that when he visited the libelant in her room after the doctor had treated her, he asked her how the accident happened, and she testified that she was pressing the lock on the door and the ship rolled, catching her finger. The injury report which the Captain signed on March 19th stated that the accident happened as follows: "The sea was rough and the ship was rolling moderately. She was standing by the door attempting to change the snap on the facing of the lock so that the door would spring-lock. An unexpected roll forcibly slammed the door upon the fingers of her right hand".

▬ I am satisfied that this unfortunate accident was not due to any unseaworthiness of the vessel, or to any negligence of the steward or of any officer or member of the crew of the vessel. The fact that the vessel did not have a handrail on the aft partition of the cabin (there was a handrail on the outside common passageway) or an automatic check on the cabin door did not make the vessel unseaworthy. There was no expert testimony on that question. Nor did the absence of either constitute negligence. I have been unable to find a case which holds that a handrail on the side wall of a cabin is required for the protection of the passenger.

As to the alleged need for an automatic door check, libelant's counsel cites the case of Osipuk v. Oceanic Steam Nav. Co., Ltd., 2 Cir., 64 F.2d 478, 479, but it is not in point. In that case the door in question was a heavy door which opened on the deck of a ship with a high sill, in constant use by the passengers. The court held that such doors are "necessarily heavy, and

the high sills to prevent the entrance of water from the decks make it an awkward matter to pass through them." The court held that such doors "should be furnished with automatic controls, and that without such a control the door in question was unsafe."

Libelant's attorney refers to a picture on Exhibit 6 (a Grace Line circular) which shows a door with an automatic door check. But that is a door which opens onto an outside deck lounge and it is equipped with an automatic door check in accordance with the opinion in the Osipuk case. The door in the case at bar is an inside cabin door, not exposed to the wind or seas, with an ordinary sill. The vessel was not unseaworthy in not having that door equipped with an automatic door check and there was no negligence on the part of the claimant (Grace Line) or its officers and crew in failing to have it so equipped.

This was an unforeseeable accident—that the passenger would keep one hand on the edge of the door and the other on the knob while the vessel was rolling, and that thus she would pull the door shut upon her hand. The Santa Luisa was a good ship. She was 459 feet long and had a displacement of 14,945 tons. She could carry only 52 passengers, but their accommodations were exceptional. She was principally engaged in the carriage of freight to and from the West Coast of South America through the Panama Canal.

Although the ship is not an insurer of the safety of its passengers, it "does owe the duty to exercise a very high degree of care for the safety of its passengers." Moore v. American Scantic Line, 2 Cir., 121 F.2d 767, 768. The accident was due to libelant's own negligence and the roll of the ship.

The first cause of action must be dismissed on the merits.

The second cause of action is based on the alleged negligence of the ship's doctor, set forth in paragraph Seventh of the libel quoted above. The doctor was highly competent. He had been a doctor for ten years. After receiving his M. D. at the Emory University School of Medicine located in Atlanta, Georgia, in June 1939 he came north and served a two year rotating surgical internship at Kings County Hospital at Brooklyn, New York. He served in the Medical Corps of the United States Army from June 1941 until October 1945, when he was discharged with the rank of captain. He then took a basic surgeon's course at the Graduate School of Medicine, University of Pennsylvania from October 1945 to May 1946. Next, he spent a year as resident in general surgery at St. Joseph's Infirmary at Atlanta. From June 1947 to November 1948 he served as a resident and as an assistant resident in neurological surgery at the Brooklyn Hospital and at the Kings County Hospital. Apparently he then became a ship's surgeon for the Grace Line for a short time and was so employed on the Santa Luisa in March, 1949.

His treatment of libelant on March 15th and the good judgment he exercised saved the top of her middle finger. I quote the following from his deposition:

"(b) On the 15th day of March 1949 I was called to see Mrs. Ludena. She stated that she was standing by the door to her stateroom attempting to change the lock so that the night latch would be operative when the ship took an unexpected roll and forcibly slammed the door on the fingers of her right hand.

"I found that several of the fingers of the right hand were severely bruised and there was probably more than one fracture.

"The right middle finger near the terminal phalanx had been partially amputated. The finger was attached by a pedicle of soft tissue on the little finger side of the middle finger. The distal fragment at the end of the finger, which was the portion partially mashed off, was bruised as if its blood supply was cut off and might not be sufficient the finger dying off and becoming gangrenous.

"There was quite a problem whether I should attempt to save this finger or whether in a lady of sixty odd years I should completely amputate it, which could have been done with one swipe of a pair of scissors.

Because the finger appeared to have a little blood supply, although obviously inadequate, I made the decision to try to save the end of the finger rather than amputate immediately.

"That decision was made because I had an ample supply of penicillin and other antibiotic drugs which I could administer to her in an amount sufficient to prevent infection, and in addition, my experience and the experience of other surgeons at sea has been that severe infections are relatively uncommon in accidents at sea.

"Of course, if I had been ashore this decision would have been considerably simple because I would have had the benefit of x-rays and other laboratory aids which would have helped me arrive at the proper decision.

"I, therefore, straightened the finger out as well as possible and loosely sewed the skin into place. I cleaned it up as well as possible and applied a sterile dressing and a splint.

"This patient, of course, was in a mild state of shock and I treated her for that with bed rest and a mild stimulant."

Dr. Stump, who examined the libelant on April 12, 1949, at the request of her doctor, found the several lacerations to be healed and reported that "surgery is not indicated at present and I doubt that it will be in the future". There is nothing in the record to show that libelant's finger had to be re-set.

During the trial, on the cross-examination of the Captain, libelant's attorney urged that the libelant should have been taken ashore at Charleston on March 19th for medical treatment and x-rays. The Captain stated that the ship's doctor said that it was not necessary. The ship's doctor had dressed the finger the day before (March 18th) and found the wound to be clean. It was not until March 20th that an infection was noted and the vessel docked in New York the following morning.

.The claimant, Grace Line, Inc., selected a competent doctor for the benefit of the passengers aboard the Santa Luisa. Entirely apart from clause 15 of the steamship ticket, there is no liability on the part of the ship or the owners. [See the cases cited in footnote No. 2 of De Zon v. American President Lines, Ltd., 318 U.S. 660, 63 S.Ct. 814, 87 L.Ed. 1065.]

The second cause of action is dismissed on the merits.