**Virgie SUMMERS, Libellant,**

v.

**The MOTOR SHIP BIG RON TOM,**
**Respondent.**

**No. 1219.**

United States District Court
D. South Carolina,
Charleston Division.

Jan. 10, 1967.

Holler & Holler, Myrtle Beach, S. C., for libellant.

Moore, Mouzon & McGee, Charleston, S. C., for respondent.

## ORDER

SIMONS, District Judge.

Libellant herein seeks to recover for personal injuries allegedly sustained while she was a paying passenger aboard the respondent fishing vessel, the M/S BIG RON TOM, on July 9, 1964. At the time of the alleged injuries, Libellant was aboard the BIG RON TOM for purposes of "bottom fishing" in the Atlantic Ocean off the coast of South Carolina.

The Libel alleges that the libellant was stationed on the deck of the vessel at a point immediately in the bow holding on to the railing as the ship proceeded through Little River Inlet to the Atlantic Ocean enroute to the fishing grounds; that the vessel suddenly encountered severe and rough seas and swirls causing the bow to heave and pitch, throwing her to the deck and breaking her ankle.

Libellant further alleges that her injuries were due to and caused by the negligence of the operator of respondent vessel in that:

1. The operator of the vessel knew, or should have known, of the existence at that time and place of weather conditions so unfavorable under the circumstances as to make an entrance into the Atlantic Ocean unsafe for the libellant and other passengers.

2. The operator of the said vessel failed to warn the libellant that her position at the bow of the vessel as aforesaid, was unsafe under the existing circumstances, thereby failing to discharge his duty to her as a paying passenger.

The answer of the respondent admits that libellant was a paying passenger aboard the BIG RON TOM on the date and time in question and that she suffered an injury to her ankle while standing in the bow of the vessel as alleged in the libel. The answer denies the allegations of negligence and further alleges that the libellant refused to comply with the instructions of the Captain of the vessel.

The injury occurred on navigable waters as the BIG RON TOM was passing through Little River Inlet. The matter is being pursued in admiralty and the issue of liability was tried by me, without a jury, in Charleston, South Carolina, on October 11, 1966. At the time of the trial libellant was still undergoing medical treatment and upon motion for counsel for the libellant and with approval of counsel for the respondent vessel, the issue concerning damages was reserved to be tried at some future date depending upon this decision of the issue of liability.

The libel contains no allegations of unseaworthiness of the vessel and no evidence of unseaworthiness was presented during the trial of the case. Therefore, the sole issue now before the court is whether the Master of the BIG RON TOM was negligent in either one or both of the particulars alleged in the complaint.

After hearing the testimony of the witness of both parties and considering the exhibits submitted in evidence during the trial of the case, I now make the following findings and conclusions of law in respect thereto.

## FINDINGS OF FACT

The motorship BIG RON TOM is a commercial fishing vessel approximately sixty-three feet long by fifteen feet in width. The hull was originally constructed as a U. S. Navy Air-Sea Rescue Vessel but following the end of World War II it was converted into a fishing

boat. The ship is owned by Peggy F. Bellamy and is operated by her husband, Captain Ronald L. (Pat) Bellamy. It is a twin screw, nine ton diesel fishing boat and is operated out of a berth just south of Little River, South Carolina, on the Intracoastal Waterway. The vessel can accommodate up to forty-nine passengers and takes parties into the Atlantic Ocean on fishing excursions for the purpose of botton fishing. A charge of approximately seven dollars "per head" is normally made and at least thirteen paying passengers are needed to cover expenses. Because of the method of charging passengers it is known in the trade as a "head boat".

The BIG RON TOM is inspected annually by the U. S. Coast Guard to insure that it is in compliance with safety regulations and can safely conduct fishing excursions out into the Atlantic Ocean. The vessel was inspected by the Coast Guard shortly before this accident occurred and it was licensed to carry up to forty-nine passengers on fishing trips. The number of passengers was determined by a Coast Guard formula which allots a given number of feet along the vessel's railing to each passenger. There is no restriction by the Coast Guard or any other governmental agency prohibiting passengers from riding in the bow of commercial fishing vessels such as the BIG RON TOM.

Captain Bellamy, the operator of the BIG RON TOM, on the date and time in question, was thirty-seven years of age and had been a licensed commercial fisherman carrying passengers on fishing excursions into the ocean for over fifteen years.

On July 9, 1964, the BIG RON TOM departed her berth about 8:20 a. m. In addition to the Captain there was a crew of two, Johnny Dennis and Tommy Hudson. Dennis testified for the respondent but Hudson could not be located and there was testimony that he had been killed in Viet Nam. The libellant was in a party of four, her husband and uncle testified for her, but her cousin is now in Viet Nam. There were three other paying passengers; one, Hoyt Cunningham of Gastonia, North Carolina, testified for the respondent but the other two were sailors whose names were unknown to either party. Finally, there were two non-paying passengers, Jimmy Winders and Johnny Vereen, and they also gave testimony favorable to the respondent.

The route followed by the BIG RON TOM from its berth to the Inlet is approximately six miles and follows the Intracoastal Waterway to a point just below the North Carolina border. There the BIG RON TOM made a ninety degree turn to starboard and proceeded through the Inlet Creek. The libellant placed into evidence a nautical chart which shows this creek to be in the lee of Waiter Island and to have varying depths between fourteen and nineteen feet. The channel is marked by buoys and passes over a submerged sandbar at the inlet mouth. A note on the chart states that, "The buoys in Little River Inlet are not charted because they are frequently shifted in position."

Because of the shallow water at the bar this area is generally rougher than the ocean itself. This is caused primarily by the tidal movement of the water passing over the restricted entrance to the inlet.

Weather forecasts for July 9, 1964, were favorable, although Captain Bellamy testified that he had not checked the forecast for that day before they departed on the fishing trip. A certified copy of weather records kept by the Regional Office of the U. S. Weather Bureau at Raleigh, North Carolina, shows that the official forecast for coastal South Carolina on that day called for southwesterly winds of eight to sixteen knots. There was no evidence of small craft warnings or anything unusual. Prior to departing and while on the Intracoastal Waterway, the Master of BIG RON TOM was in radio communication with other fishing vessels which had already passed through Little River Inlet and they reported only normal weather

conditions. Captain Leroy Mintz, Master of the "Hurricane", was out fishing in this same area on the date of libellant's injury with approximately 100 fishermen on board in all areas of his ship. Also, Captain Thomas Vivian Bessent was out fishing that day in the same area with forty to forty-nine passengers aboard his "New Rascal". Both Captains testified that there was nothing unusual or dangerous about the weather that day.

The respondent also introduced a certified copy of weather records for the month of July 1964 made by the Cooperative Hurricane Reporting Station at Ocean Drive Beach, only a few miles from Little River. This shows that at 7:30 a. m. the wind was out of the southwest at ten knots.

From the evidence adduced at the trial there was no indication that any of the other fishing vessels operating out of the Little River area encountered any difficulty from weather or seas at any time that day. Therefore, I can conclude only that weather conditions were normal, and that the libellant has failed to prove her first allegation of negligence.

I next consider libellant's allegation that the operator of BIG RON TOM was negligent in failing to warn libellant that her position in the bow of the vessel was unsafe.

Mrs. Summers, her husband, and a third member of their party, Wade Lamb, all testified that they were riding in the bow of the vessel when it suddenly "went wild"; that they were hanging on the railing unable to move and that the motion of the bow tossed them up and down. Libellant failed to introduce any evidence other than this testimony of the conditions existing as BIG RON TOM entered Little River Inlet.

The evidence introduced by the respondent substantiates that weather and tide conditions existing at the inlet were normal. The tide was ebbing and was about half out, minimum depth over the bar was about six feet, and the wind was about ten knots out of the southwest, which is a normal breeze both as to velocity and direction. The height of waves under these conditions would vary up to a maximum of three feet, which is not an unusual condition. One veteran boat captain testified that he had not observed six foot waves at this spot since the last hurricane.

Numerous fishing boats go in and out of Little River Inlet every day during the summer months. It is the custom of all of the head boats to allow passengers to ride in the bow throughout the voyage. There are now five such fishing boats in the Little River area and four captains in addition to Captain Bellamy, explained that some passengers, especially the young and those who have not been out before, prefer to ride in the bow in order to enjoy the sensation of the open air and the pitching motion which is most noticeable in the bow. This practice is not prohibited by Coast Guard regulations and is the custom in the trade. Captain Vivian Bessant testified that he had been taking boats in and out of Little River for over thirty years and that he operates a head boat with a hull identical to the BIG RON TOM. He testified that during the season he invariably carries a minimum of thirty-five to forty passengers and that there are always some in the bow throughout the voyage.

Mrs. Summers, her husband and Wade Lamb are all from Charlotte, North Carolina, and admitted that they had practically no experience in ocean fishing and were complete strangers to the ways of boats. This is borne out further by their testimony. Wade Lamb testified that the waves at the inlet were as high as twelve to fifteen feet, which was entirely improbable under existing conditions. Mr. and Mrs. Summers stated that the Captain had ordered the crew to break out life preservers and had warned that the boat was about to capsize shortly after she fell. The Captain stated that he did call for one life preserver to use as a pillow for Mrs. Summers after she was injured and obviously the boat was in no

danger of capsizing in six feet of water under the existing conditions. The preponderance of the evidence indicates that the weather and other conditions at Little River Inlet on the morning in question were normal and that it was not negligence for the Captain to allow libellant to ride in the bow of the respondent vessel.

There is a conflict of testimony as to the way in which libellant fell. She and two of her witnesses testified that she had been merely standing on the deck but that the pitching motion of the vessel threw her up into the air and that her ankle was broken when she fell back onto the deck. The Master of the vessel and several of respondent's witnesses testified that Mrs. Summers was jumping up and down with the motion of the vessel and that the Master and one crew member tried unsuccessfully to restrain her just before she fell. From the weight and credibility of the evidence, I find and conclude that Mrs. Summers who was admittedly enthusiastic on her first sea voyage was jumping with the motion of the vessel and that she did disregard a warning from the Master and did ignore his direction through a member of the crew to be seated. Nevertheless, even though a warning was given, I would find none necessary under the existing weather conditions for passengers riding in the bow of the ship who exercised due care for their own safety. I find no negligence on the part of respondent and further find that libellant's injuries were caused solely by her failure to exercise reasonable care for her own safety under the circumstances.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and the subject matter of the action.

2. At the time of her injury libellant was a paying passenger aboard the respondent vessel.

3. A vessel is not the insurer of the safety of a passenger. Elder Dempster Shipping Co. v. Pouppirt, 125 F. 732 (4th Cir. 1903). However, respondent owes to its paying passengers the highest degree of care, prudence, and foresight in the operation of its vessel, consistent with proper management thereof. Pacific S. S. Co. v. Holt, 77 F.2d 192 (9th Cir., 1935); Maibrunn v. Hamburg-American S. S. Co., 77 F.2d 304 (2nd Cir. 1935). The ship operator in the exercise of his duty for the safety of passengers must warn passengers of dangers which the vessel's employees may reasonably anticipate from weather conditions or other reasons, which are not readily apparent to passengers, and the vessel is liable for injuries to such passengers which may have been avoided had due warning of the danger been given. Pacific S. S. Co. v. Holt, supra.

4. Nevertheless, the injured libellant must prove negligence on the part of the operator of the vessel as alleged in her libel in order to recover. The Great Northern, 251 F. 826 (9th Cir. 1918); Ludena v. The Santa Luisa, 112 F.Supp. 401, 1953 Am.Mar.Cas. 533 (S.D. N.Y.1953); Rohde v. N. V. Nederlandsch Amerikaansche Stoomvart Maatschappij, 156 F.Supp. 309, 1957 Am.Mar.Cas. 1826 (S.D.N.Y.1957); Van Nieuwenhove v. Cunard Steam-ship Co., 216 F.2d 31, 1955 Am.Mar.Cas. 642 (7th Cir. 1954); Savage v. New York, N. & H. S. S. Co., 185 F. 778 (2nd Cir. 1911); The Anchoria, 83 F. 847 (2nd Cir. 1897); Moses v. Compagnie Generale Transatlantique, 16 F.Supp. 197, 1936 Am.Mar.Cas. 1046 (E.D.N.Y.1936).

5. Under the existing weather conditions no dangerous situation was created for passengers riding in the bow of the vessel who exercised due care for their own safety. Therefore in the exercise of due care on the part of the Master there was no duty to warn libellant and the other passengers to remove themselves from the bow of the vessel. Since the Master did warn and did direct the libellant to be seated while she was jumping in the bow with the motion of the vessel the sole cause of her injury

was from her own failure to exercise due care for her own safety. Under the circumstances the Master exercised due care for the safety of libellant.

6. It is the custom of all "head boats" operating in the Little River, South Carolina area to allow passengers to ride in the bow throughout the passage from Little River to the Atlantic Ocean and there is no law or Coast Guard regulation or other prohibition against this practice.

7. There were no unusual or dangerous conditions resulting from the weather, tide or wind existing on that occasion which required the vessel in the exercise of its proper degree of care (the highest degree) toward its passengers to give them instructions or warnings as to where they should ride, or what they should do under the circumstances.

8. "It is a matter of common knowledge that the movements of fishing boats and other small water craft are constantly affected by the waves and thereby made unsteady, and that this is true without regard to the care exercised in their operation. The bigger the waves the more vigorous is the impact on the boat and the more severe and sudden the lurch or jerk caused thereby. Anyone who has ever been on such a boat or who has observed their movements from the shore, particularly when the tide was coming in, has observed how the waves upon occasion cause these boats to pitch and churn. Such vigorous and unpredictable movements may readily cause a person to lose his balance and fall. * * This is simply one of the natural hazards of this type of venture." Lockhart v. Martin, 159 Cal.App.2d 760, 324 P.2d 340, 341, 1962 Am.Mar.Cas. 1076, 1078 (1958).

9. Libellant has failed to carry her burden of proof to establish any actionable negligence on the part of respondent which was the proximate cause of her injuries and damages. Therefore, she is not entitled to recover in this action. Let judgment be entered accordingly.

And it is so ordered.