**Julius ARONOWITZ**

v.

**Victor MOLERO, Jr. d/b/a Vic's Boat Rental.**

**No. 7556.**

United States District Court
E. D. Louisiana.

New Orleans Division.

Sept. 26, 1967.

Sherman F. Raphael, New Orleans, La., for libelant.

Phelps, Dunbar, Marks, Claverie & Sims, by James H. Roussel, New Orleans, La., for respondent.

MITCHELL, District Judge.

This is a libel in admiralty by which the libelant, Julius Aronowitz, is seeking damages for personal injuries allegedly sustained while on board re-

spondent's vessel, the M/V Flare, on August 15–16, 1964. After having heard the evidence and considered the law, the Court makes the following:

## FINDINGS OF FACT

### I

Libelant, Julius Aronowitz is a resident of and domiciled in the Parish of Orleans, State of Louisiana. He is 46 years of age, weighs approximately 225 pounds, and is self employed as a merchant tailor.

### II

Respondent, Victor Molero, Jr. is a resident of and domiciled in the town of Arabi, State of Louisiana, and at all times hereinafter mentioned was the owner of the M/V Flare. Respondent is in the business of chartering vessels to parties for fishing expeditions in the inland and coastal waters of south Louisiana.

### III

The M/V Flare is an undocumented vessel of the United States, measuring approximately twenty and one-half feet in length. She was registered with the Louisiana Wildlife & Fisheries Commission. She is of molded fiberglass construction with three vee-shaped hulls and is powered by an inboard-outboard engine which develops 190 horsepower. Her top speed is estimated to be 32 mph. She is not required to be inspected by the U. S. Coast Guard as she carries less than six passengers. Actually, she has been inspected by both the Louisiana Department of Wildlife & Fisheries and the United States Coast Guard. Her master is licensed by the Coast Guard.

### IV

The Flare is an open-cockpit vessel with a canvas convertible top and molded grab rails along each side. Her deck is covered with non-skid marine paint.

### V

Respondent purchased the Flare in early August, 1964, at which time she was equipped with three permanent seats located in her forward portion, one being for the operator and the other being a bench adjacent thereto which seated two persons. Respondent placed a large ice chest, measuring approximately four feet in length, eighteen inches in width, and eighteen inches in depth, aboard the Flare. This ice chest, which was on the port side, aft, had a padded top and served the dual purpose of seating three persons. The engine cover, also padded, could seat three persons.

### VI

In response to an advertisement placed by respondent in a New Orleans newspaper, advertising the availability of the M/V Flare for charter fishing parties, libelant made arrangements to charter the vessel for the night of August 15–16, 1964, for a fishing trip to one or more of the lighted gas flares located in the coastal waters of Louisiana adjacent to the Gulf of Mexico. The agreement provided that respondent would furnish the vessel, an operator, ice and bait.

### VII

On the night of August 15, 1964, libelant and four friends arrived at respondent's landing at Hopedale, Louisiana at approximately 10:00 P.M. and boarded the Flare.

### VIII

As soon as the party was on board, the Flare proceeded from Hopedale to the Mississippi River Gulf Outlet, thence down that channel to Lake Athansio and thence north into Eloi Bay to a lighted gas flare located just northeast of Deadman Island.

### IX

The passage to the lighted flare was uneventful. The Flare's master testified that he operated her at full speed, estimated to be 30 mph, from Hopedale to Eloi Bay and then reduced her speed on entering the bay due to the ten to twelve inch waves which were encountered. He received no complaints from his passengers.

## X

After fishing at the flare at Eloi Bay for several hours, without success, the master of another of respondent's vessels, the Gary Boy, approached and suggested that the two vessels fish at another flare. Libelant and his party were agreeable to this change of locations.

## XI

Upon receiving the assent of their passengers, the two vessels started to a second gas flare located in Lake Machias, which is southwest of the Mississippi River Gulf Outlet. The two vessels were traveling together in accordance with respondent's instructions for his vessels when fishing at night.

## XII

The trip across Eloi Bay was uneventful, with ten to twelve inch waves and the wind out of the south. As the vessels rounded the mouth of the Mississippi River Gulf Outlet, the waves increased to 18 to 24 inches due to the fact that the wind was from the south and the vessels had lost the protection of the jetties.

After proceeding about 200 yards past the protection of the jetties, the captain of the Flare decided to return to the flare in Eloi Bay because the flare in Lake Machias was exposed to open seas and would be uncomfortable for fishing. After returning to the flare in Eloi Bay, libelant and his party fished for several hours and then returned to Hopedale.

## XIV

Libelant claims that he was injured on the trip to the second flare, after the vessel left the protection of the jetties, because the lack of seating capacity aboard the vessel required that he stand in the cockpit of the vessel. As a consequence thereof, he claims that the pounding of the vessel knocked him from his feet, causing him to fall and strike his chest on an ice chest.

## XV

This Court holds that libelant failed to show that respondent's employee was negligent in the operation of the Flare or caused libelant's fall. On the trip to the second flare, when libelant claims he fell, the master of the Flare did not operate her in excess of 12 to 15 mph in seas of approximately two feet.

## CONCLUSIONS OF LAW

### I

This is a libel for personal injuries received on the navigable waters of the United States. Accordingly, this Court has jurisdiction. The Plymouth, (1865) 3 Wall. 20, 70 U.S. 20, 33 L.Ed. 125; 28 U.S.C. 333.

### II

■ It is clear that libelant was a passenger for hire and therefore aboard the vessel for purposes not inimical to the interests of respondent, and therefore respondent owed libelant the duty of exercising reasonable care under the circumstances. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); Fidelity & Casualty Company of New York v. C/B Mr. Kim, (CA 5–1965) 345 F.2d 45.

### III

■ Respondent was not the insurer of the safety of libelant. The City of Panama, 101 U.S. 453, 25 L.Ed. 1061 (1880); Moore v. American Scantic Line, Inc., 121 F.2d 767 (CCA 2–1941).

### IV

■ Respondent does not owe libelant the warranty of seaworthiness. Talton v. United States Lines, 203 F.Supp. 17 (D.C.1962); Kermarec v. Compagnie Generale Transatlantique, supra.

### V

■ The injured libelant must prove negligence on the part of the operator of the vessel, as alleged in his libel, in order to recover. Rhode v. N. V. Nederlandsch Amerikaansche Stoomvart Maatschappij, 156 F.Supp. 309 (SDNY–1957); Van Nieuwenhove v. Cunard Steamship Co., 216 F.2d 31 (CA 7–1954);

Savage v. New York, N. & H. S. S. Co., 185 F. 778 (CA 2–1911); Moses v. Compagnie Generale Transatlantique, 16 F.Supp. 197 (EDNY–1936); Summers v. Motor Ship Big Ron Tom, 262 F.Supp. 400 (EDSC–1967).

## VI

There were no unusual or dangerous conditions resulting from the weather or the seas existing on that occasion which required the vessel's master, in the exercise of the proper degree of care toward her passengers, to give them special instructions or warnings as to where they should ride, or what they should do under the circumstances. The conditions encountered were obvious to the passengers, all experienced fishermen, and they should have taken appropriate measures.

## VII

"It is a matter of common knowledge that the movements of fishing boats and other small water craft are constantly affected by the waves and thereby made unsteady, and that this is true without regard to the care exercised in their operation. The bigger the waves the more vigorous is the impact on the boat and the more severe and sudden the lurch or jerk caused thereby. Anyone who has even been on such a boat or who has observed their movements from the shore, particularly when the tide was coming in, has observed how the waves upon occasion cause these boats to pitch and churn. Such vigorous and unpredictable movements may readily cause a person to lose his balance and fall. * * * This is simply one of the natural hazards of this type of venture." Summers v. Motor Ship Big Ron Tom, supra. The M/V Flare was properly outfitted and equipped for the fishing trip in question, and her operator acted reasonably and properly under the circumstances. If libelant was injured, the injury was fortuitous, resulted from a risk which he assumed, or was caused by his own disregard for his safety.

## VIII

Libelant has failed to carry his burden of proof to establish any actionable negligence on the part of respondent which was the proximate cause of his injuries and damages and, therefore, he is not entitled to recover in this action. Let judgment be entered accordingly.