Frederick E. **SHERMAN**, an infant under the age of 14 years, by his Next Friend, Earl Sherman, and Earl Sherman, Individually, Libelants,

v.

**UNITED STATES of America,**
**Respondent.**

No. 65–C–289.

United States District Court
E. D. Wisconsin.

April 30, 1968.

See also D.C., 246 F.Supp. 547.

Alexis J. Rogoski and Robert Bunker Rogoski, Muskegon, Mich., August E. Fabyan, Jr., Pewaukee, Wis., for libelants.

James B. Brennan, U. S. Atty., by Robert J. Lerner, Asst. U. S. Atty., Milwaukee, Wis., Thomas J. Boyle, Admiralty & Shipping Section, United States Department of Justice, Washington, D. C., for respondent.

## DECISION AND ORDER

REYNOLDS, District Judge.

### I.  BACKGROUND

This action is one in admiralty. The libelant (plaintiff), Frederick E. Sherman, alleged that he sustained certain injuries while a guest aboard the U.S.S. Portage and that these injuries were caused by the negligence of the crew. This case was tried to the court on December 18, 1967.

### II.  UNDISPUTED  FACTS

On June 30, 1962, Frederick E. Sherman was 11 years old. Shortly after lunch on that day, he and a companion, Leroy Berghuis, left for the harbor in Muskegon, Michigan, to attend a "public visitation" of certain Navy vessels, among them the U.S.S. Portage. Plaintiffs introduced as evidence a copy of a newspaper clipping which they claimed induced Frederick and his friend to go down to the harbor.

According to the testimony of Frederick and Leroy, they first boarded the Portage by ascending a gangplank put there for the purpose, gave it a "once over, real fast," and then went to another ship. After giving the other ship "the once over," they went back to the Portage. On returning to the Portage, they discovered a "stand and start" line of people going up the gangplank. At the top of the gangplank, two sailors were

handing out sailor hats and a publicity sheet about the vessel. The two boys took the hats and sheets from the sailors and started touring the ship. Though the respondent (defendant) introduced deposition testimony of the Portage's commander to the effect that children of twelve and under were not to be admitted without adult supervision, both Frederick and Leroy testified that they boarded the ship without any objection or question being raised as to their age. It is clear that the U.S.S. Portage was conducting a so-called "public visitation" on the day in question and that the sailor hats and pamphlets were handed out. Indeed, up to this point there is no serious dispute about the facts of this case.

### III. STORY OF PLAINTIFFS

From this point on, there is divergence between plaintiffs' evidence and defendant's. In general, the picture etched by plaintiffs is that small boys were left unsupervised to roam into mischief while aboard the vessel. According to Frederick and Leroy, the two boys first went to the "turret gun," tried to get inside the firing area, and found they could not. Then they went to the "machine gun" which they were able to "aim" at a nearby hotel. After this, they went inside the hull of the ship to look around. They emerged on deck near the stern of the vessel at a point near the ship's 40 mm. gun which they described as an "anti-aircraft gun." This gun was mounted on a platform and elevated a considerable distance from the main deck. The gun and platform were surrounded by a steel cylinder, informally called a "tub."

According to Frederick and Leroy, they saw a line of about ten boys waiting to operate the gun. Because they thought this would be fun, they got in the line which was "fairly orderly." After waiting about three or four minutes, Frederick took the seat on the righthand side of the gun. There seems to have been at least one sailor near the gangplank about 20 feet from the gun tub.

But no sailor was in the tub and no one was keeping order in the line. After Frederick had spent a few moments in this position, a dispute arose about possession of the seat. Another boy about the same age shoved Frederick, and Frederick shoved back. After a couple of shoves, Frederick was dislodged from the gun seat and fell from the platform to the bottom of the tub. The other boy, described only as a colored boy, disappeared and could not be found.

### IV. STORY OF DEFENDANT

None of defendant's witnesses actually saw Frederick fall, and defendant was able to produce no direct evidence of Frederick's activities before he fell from the gun seat. But defendant did introduce evidence to the effect that the incident could not have happened as Frederick and Leroy described it. In particular, two Navy men testified that all guns were secured and that the entranceway to the 40 mm. gun tub was blocked off by crisscrossed rope. One of these men, whose attention was first attracted to the gun tub by Frederick's scream, testified to seeing three or four boys on the gun platform at about the time of the accident. Defendant apparently theorizes that Frederick and several other boys either wiggled between the ropes or mounted a ladder in the rear of the gun platform before attracting the attention of Navy men who were stationed only a short distance away. Evidence was also introduced that orders were given to forbid entry on the vessel to any child under twelve not escorted by an adult. However, the fact is that these orders seem not to have been enforced.

### V. DAMAGES

It was stipulated at trial that plaintiffs incurred a total of $494.55 in "reasonable and necessary" medical expenses as a result of the accident aboard the U.S.S. Portage. In dispute is the extent of "pain and suffering" and of permanent disability.

On these questions, the plaintiff introduced the deposition testimony of Dr.

John D. Folsom, an orthopedic specialist, who treated Frederick. Dr. Folsom testified that he first treated Frederick at the hospital to which he was taken on the day of the accident, June 30, 1962. On that day, Dr. Folsom discovered that Frederick's arm was broken, set it without the use of pins, i. e. by a "closed reduction," and placed it in a cast. On July 4, 1962, Frederick was discharged from the hospital. On July 31, 1962, Dr. Folsom found it necessary to remove the old cast, reset the arm with the aid of pins, i. e. by an "open reduction," and put it in a new cast. On August 17, 1962, Dr. Folsom removed the pins and the cast. Frederick returned for examination on April 18, 1963, and again on December 30, 1966. The later examination was solely for the purpose of the doctor's testimony in this suit. It was on all these examinations taken together that the doctor's testimony was based.

It appears that the range of motion of Frederick's arm, both as to extension and as to flexion, is slightly limited (15° on flexion, 40° limit on extension) and will remain limited. The muscular strength of Frederick's hand, however, was, in the doctor's words, "excellent." Frederick testified that in cold weather two of his fingers get cold and stay cold for long periods of time and indicated that he got cramps in the same fingers after writing for long periods of time. Dr. Folsom detected no permanent disability of a "motor nature," but a "fair degree of permanent disability of a sensory nature." Frederick testified that as a result of the accident, his "crazy bone" had been exceptionally sensitive for at least a year. Dr. Folsom indicated that Frederick's "ulnar nerve" was left too close to the surface of the arm by the surgery and that there was some possibility of a nerve transplant being required in the future.

There is no question that the broken arm and medical treatment of that arm caused Frederick a good deal of pain and discomfort, and Frederick and his father, Earl Sherman, testified to that effect in detail.

## VI. CONCLUSIONS

This court believes the plaintiffs' version of the events of the day to be closely in accord with the facts. Specifically, it believes that the boys were left free to wander about the ship unescorted. It also believes that there was no rope or effective guard across the main entrance to the gun, that a line of boys did wait to mount the platform, that naval personnel paid no attention to the crowd of boys gathering around the gun until the accident, and that no crew member was on the platform or otherwise situated close enough to it to provide effective supervision.

A preponderance of the evidence in this case indicated that these injuries were the result of the accident on the Portage.

This court believes that $5,000 would adequately compensate Frederick E. Sherman for pain, suffering, and permanent disability incurred in the accident. Counting reasonable medical expenses into the total sum, this means that $5,494.55 would provide Frederick reasonable overall compensation for his injuries.

However, this court also believes that as a matter of law plaintiffs are not entitled to recover.

This action is one in admiralty (a "libel") seeking damages for personal injuries received on the navigable waters of the United States. 28 U.S.C. § 1333. Thus, this court must apply admiralty law in determining the rights and liabilities of the parties. Under admiralty law, the United States owed Frederick E. Sherman the duty of exercising reasonable care. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). In effect, Frederick must prove negligence in order to recover. Aronowitz v. Molero, 273 F.Supp. 226 (E.D. La.1967).

In this case, the immediate cause of Frederick's injuries was the unidentified boy who pushed him off the gun platform. To find the United States liable in these circumstances, the court would have to find that naval personnel knew or should have known that the injuries alleged were likely to be inflicted. Blitz v. Boog, 328 F.2d 596, 599 (2d Cir. 1964). Some courts have imposed higher standards than reasonable care on those operating recreational facilities for children for purposes of profit. E.g., Johnson v. Amphitheatre Corp., 206 Minn. 282, 288 N.W. 386 (1939). Of course, these cases seem to establish rules applicable to profit-making ventures and not to governments, governmental subsidiaries, or government corporations. Diker v. City of St. Louis Park, 268 Minn. 461, 130 N.W.2d 113, 117 (1964). But even these cases recognize that defendants must know or have reason to know that the injured party was endangered by the actions of the party injuring him. Id. at 116.

In the view of this court, the United States did not and could not have foreseen that Frederick would be pushed from the gun tub by a third person and would suffer injuries as a result. Navy personnel could not have known that Frederick was in need of protection from the boy who pushed him. In these circumstances, this court is compelled to conclude that the harm suffered was not foreseeable by defendant and that therefore negligence has not been proved. See Frederic v. United States, 246 F. Supp. 368 (E.D.La.1965); Franklin v. United States, 342 F.2d 581, 584 (7th Cir. 1965).

Even if the United States were negligent, this negligence was not a substantial factor in producing Frederick's injuries and therefore not their "proximate cause" in view of the conduct of the unidentified boy who pushed Frederick from the gun platform. See Wisconsin Jury Instructions—Civil—Part II 1500.

The foregoing opinion constitutes this court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

### VII.  ORDER

It is therefore ordered that judgment must be and it hereby is entered on behalf of defendant, the United States of America.