Phil GIBBONEY, as owner of the SAIL-BOAT LOVE MACHINE in an action for exoneration from or limitation of liability, Petitioner-Appellee-Cross-Appellant,

v.

Carol WRIGHT and her minor children, Forest and Simeon Wright, Respondents-Appellants-Cross-Appellees.

No. 73–3577.

United States Court of Appeals, Fifth Circuit.

Aug. 22, 1975.

John M. Brumbaugh, Miami, Fla., for respondents-appellants.

George O. Mitchell, Miami, Fla., for petitioner-appellee.

Before BROWN, Chief Judge, and AINSWORTH and DYER, Circuit Judges.

BROWN, Chief Judge:

This appeal attacks the District Court's order granting limitation of liability to an owner of a sailing vessel on the grounds that the owner had privity or knowledge of the defect which gave rise to the injury. The shipowner, in turn, appeals from the order denying exoneration. We affirm.

In February of 1971 Phil Gibboney placed an order with Raymond Creekmore for the construction of a thirty foot racing sloop, named, of all things, the LOVE MACHINE, to be built to Creekmore's specifications. By January of 1972, although considerable interior work remained to be finished, the hull was complete, and so, on the 14th the boat was placed in the water to perform an initial hull test. At the same time Gibboney arranged for a survey to be performed by Donald J. Mahoney & Co., a local Lloyds marine surveyor with an eye toward obtaining insurance on the boat. In order to more closely approximate the trim of the boat when completed, the fuel tank for the auxiliary motor was placed as closely as possible in the position it was to occupy upon completion and filled with water.

After completing his inspection the surveyor, Brian Mahoney, made four recommendations to Creekmore and Gibboney. One of these—the one that concerns us here—did not appear in the final formal report—that the fuel tank should be bulkheaded and strapped in position. Mahoney testified that Creekmore told him it would be done "within a short period of time." Some days later, after the boat had been returned to the Creekmore yard for completion, another inspection was made by Angel Naya, also a Mahoney & Co. employee. Naya did not inspect the fuel tank installation. Nevertheless, relying on Creekmore's earlier assurance he would follow up on Mahoney's recommendation, the surveyors in their final report dated

January 27 described the fuel tank as "Bulkhead[ed] & strapped."

The LOVE MACHINE was completed and delivered to Gibboney at St. Petersburg, Florida in February. After appropriate shakedown Gibboney entered the sloop on the racing circuit and for the next five or six months sailed it without incident. On several occasions Harlan Wright, the father of the two small boys who are appellants here, crewed aboard the LOVE MACHINE. In addition, Wright, a shipfitter by trade, performed more than a hundred hours' worth of general maintenance on the boat for pay during this period.

That Mahoney and Naya ought never have relied simply on Creekmore's promise to secure the fuel tank became tragically clear on July 4, 1972. On that day at the Coral Reef Yacht Club Harlan Wright approached Gibboney, who had just finished cleaning up the boat after the Miami-Bahamas race the previous weekend, and asked if he could borrow the LOVE MACHINE to take his family to see a fireworks display that same evening. Gibboney assented.

Around seven o'clock Wright with his wife and two small sons returned to the Yacht Club and boarded the LOVE MACHINE. Prior to getting underweigh Wright ascertained that the fuel tank was virtually empty and so motored to the Merrill-Stevens dock a short distance away to purchase fuel. After fueling, Wright waited three to five minutes and then started the motor. While in the process of casting off from the dock, a flash fire occurred, the flames leaping out of the cabin, through the companion-way and burning the two boys standing near the open hatch.

Subsequent inspections revealed the probable cause of the fire. Fire Inspector T. L. Williams of the Miami Fire Prevention Bureau was called to the scene immediately after the fire. Captain Milton Jones, an experienced marine surveyor, examined the boat the next day before it was moved from the Merrill-Stevens fueling dock. Both agreed. The fuel tank was not secured in any way. The hose connecting the fuel tank to the filler pipe mounted in the cockpit had separated from the filler pipe because the fuel tank had shifted forward some two inches. Consequently, the six gallons of fuel pumped by Wright into the filler pipe had gone directly into the bilges instead of into the tank.[1]

In the fall of 1972, Carol Wright, the mother of the injured boys, filed two separate personal injury suits in the Florida State Court against Phil Gibboney as owner and Raymond Creekmore as builder of the LOVE MACHINE. Wright alleged that Gibboney negligently maintained the LOVE MACHINE and that Creekmore negligently installed the fuel system in failing properly to secure the fuel tank.

On December 13 Gibboney filed a petition for exoneration from or limitation of liability in the United States District Court for the Southern District of Florida. 46 USCA § 183 et seq. Gibboney filed the traditional ad interim stipulation for the value of the LOVE MACHINE in the amount of $20,000.00. Claimants were enjoined from further prosecution of their cases[2] in state court

---

1. The two were not in agreement, however, as to the probable source of the spark that ignited the fire. There is testimony in the record to indicate that Wright, and perhaps others, had a lighted cigarette in his hand at the time of the fire. Captain Jones' opinion was that this cigarette was the most likely source of combustion. Inspector Williams, on the other hand, believed that the pattern of the flash fire—bursting up through the companionway rather than emanating from beneath the cockpit floor—indicated that the probable source was the ignition system of the motor itself. The question, although an interesting one, need not be resolved on this appeal.

2. There is no indication why, in the limitation proceeding filed solely by Gibboney as vessel owner, the injunction ran specifically against Creekmore as well. The sparse appendix reveals no basis on which the builder could claim limitation. Cf. Guillot v. Cenac Towing Co., 5 Cir., 1966, 366 F.2d 898, 1966 A.M.C. 2685; Pershing Auto Rentals, Inc. v. Gaffney, 5 Cir., 1960, 279 F.2d 546, 1960 A.M.C. 1287.

and on January 26, 1973 Wright filed her answer and made claim for damages of $1,000,000.00 for each of the boys, an amount far in excess of the potential limitation fund.

After a trial on the Admiralty side of the District Court, the Judge entered his order denying exoneration but limiting liability to the stipulated value of the boat ($20,000.00). It is from this order that the appeal is taken.

Claimants assert that the District Court was in error in (i) not extending the "personal participation" standard of Coryell v. Phipps, 1943, 317 U.S. 406, 411, 63 S.Ct. 291, 293, 87 L.Ed. 363, 367, 1943 A.M.C. 18, 22, to include negligent failure to discover, (ii) finding that Gibboney did not have privity or knowledge of the defectively secured fuel tank, and (iii) in not finding that he had privity or knowledge due to his vicarious liability for the report of his agent, Brian Mahoney. Gibboney, of course, asserts that he did not have privity or knowledge of the defect and, as an anchor to windward, cross-appeals claiming that the District Could should have granted exoneration because, although the LOVE MACHINE was unseaworthy, his duty to the Wrights was not to provide a seaworthy vessel but rather merely to exercise reasonable care.

■ At the outset, we acknowledge that contemporary thought, see e. g. ·Petition of Porter, S.D.Tex., 1967, 272 F.Supp. 282, 1968 A.M.C. 2310; Gilmore & Black, The Law of Admiralty 880–84 (2d Ed. 1975), finds little reason for allowing private owners of pleasure craft to take advantage of the somewhat drastic—for the injured claimants—provisions of the Limitation Act.[3] Nevertheless, the cases,[4] as well as Congress,[5] have spoken with a clear voice. And we must heed their words.

Given then that the weekend sailor is as privileged to limit liability for damages committed by his yacht as are hard-pressed commercial owners for those by their multi-tonnaged merchantmen plying their trade across the crowded shipping lanes, the question becomes whether Gibboney had "privity or knowledge" of the defectively secured tank. 46 U.S. C.A. § 183(a).

■ What is meant by privity or knowledge is not easy to pin down. Older cases state that the Limitation Act imposes upon shipowners a lower standard than the duty to exercise due diligence of the Harter Act, 46 U.S.C.A. § 191 and the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303. Earle & Stoddart v. Ellerman's Wilson Line, 1932, 287 U.S. 420, 426, 53 S.Ct. 200, 201, 77 L.Ed. 403, 407, 1933 A.M.C. 1, 3; Southern Pacific Co. v. United States, 2 Cir., 1934, 72 F.2d 212, 215, 1934 A.M.C. 1185, 1189. More recent cases, however, have indicated a substantial similarity in the two standards. Asbestos Corp. v. Compagnie de Navigation Fraissinet, S.D.N.Y., 1972, 345 F.Supp. 814, 1972 A.M.C. 2581; Accinanto Ltd. v. Cosmopolitan Shipping Co., D.Md., 1951, 99 F.Supp. 261, 1951 A.M.C. 1464. In any event it seems clear that privity or knowledge must turn on the facts of the individual case. Coryell v. Phipps, 1943, 317 U.S. 406, 411, 63 S.Ct. 291, 293, 87 L.Ed. 363, 368, 1943 A.M.C. 18, 22.

■ In Coryell v. Phipps, Justice Douglas drew a distinction between the privity or knowledge of a corporate owner and that of an individual owner. In denying the applicability of cases involving corporate owners, he stated "those cases are no authority for holding that the negligence of a subordinate may be imputed to an individual owner so as to place him in privity within the meaning of the statute." Id. at 410, 63 S.Ct. at 293, 87 L.Ed. at 367, 1943 A.M.C. at 21. Rather, for individual owners privity or knowledge "means some personal participation of the owner in the fault or negli-

---

**3.** 46 U.S.C.A. §§ 181–89.

**4.** E. g. Coryell v. Phipps, 1943, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363, 1943 A.M.C. 18.

**5.** See Judge Seals' analysis of the Act in *Petition of Porter*, 272 F.Supp. at 285–86, 1968 A.M.C. at 2315–16.

gence which caused or contributed to the loss or injury." *Id,* at 411, 63 S.Ct. at 293, 87 L.Ed. at 367, 1943 A.M.C. at 22.

█ In contention (i) appellants urge on us a *number of cases,* including some of our own, that hold that the owner has privity or knowledge "where he had means of knowledge or where knowledge would have been obtain[ed] from reasonable inspection." Sylve v. Gravolet Canning Co., E.D.La., 1967, 278 F.Supp. 669, 673. The Fifth Circuit cases cited for this proposition are readily distinguishable from the fact situation before us. China Union Lines v. A. O. Anderson & Co., 5 Cir., 1966, 364 F.2d 769, 1966 A.M.C. 1653 (corporate owner ignored chief engineer's recommendation that all auxiliary engineering equipment be opened, inspected and overhauled); Avera v. Florida Towing Corp., 5 Cir., 1963, 322 F.2d 155, 1963 A.M.C. 2110 (owner attempted to insulate himself from liability by issuing standing instructions that he should have known were not being complied with); The Friendship II, 5 Cir., 1940, 113 F.2d 105, 1940 A.M.C. 1110 (owner put on notice of the defect by two previous incidents and made only cursory attempts to repair).

The District Court impliedly found that the fact that the fuel tank was improperly secured was not a defect that Gibboney should have discovered through "reasonable inspection." Not only is this a conclusion that we are bound to uphold unless clearly erroneous, F.R.Civ.P. 52(a); Davis v. Parkhill-Goodloe Co., 5 Cir., 1962, 302 F.2d 489, 491, 1962 A.M.C. 1720, 1721, but it is one with which we would agree were we finding the facts.

There are at least four factors that militate against a finding that Gibboney should have discovered the defect through reasonable inspection. First, there is Gibboney's justifiable reliance on Creekmore's good reputation as a boatbuilder. Second, a competent and respected marine surveyor, Donald J. Mahoney & Co., had described the fuel tank in its final report as bulkheaded and strapped. Third, Gibboney had sailed the boat for almost six months, presuma-

bly under all types of weather conditions, with absolutely no indication that the recommended work had not been done. Fourth and perhaps most significant is the very real inaccessibility of the fuel tank revealed to us by the photographs put into evidence in the Court below.

From the testimony of Captain Milton Jones, the marine surveyor who inspected the boat the day following the fire, and from the photographs he took at that time, we believe we have an accurate understanding of the location of the fuel tank. In order to see the tank at all, it is necessary to first step down into the stowage compartment formed by the port-side seats in the cockpit. Then getting down on hands and knees and peering through a cutout in the longitudinal bulkhead forming the inboard side of the stowage compartment, the person is able to see one side of the fuel tank. No other view of the tank is possible without cutting away some portion of the cockpit sole or cabin bulkhead. To further complicate matters, the boatyard had apparently placed a plywood crosspiece across that portion of the fuel tank that was visible. This piece of plywood appeared to be a support or brace for the tank, but in point of fact seems to have had no function at all and offered no support. Although this difficult inspection would reveal that that side of the tank was not strapped and bulkheaded, the only way for the shipowner to ascertain the condition as to the other side of the tank was to cut away a portion of the cabin sole or bulkhead. In light of this combination of circumstances, the Judge was warranted in finding that Gibboney would not have discovered this defective condition by a *reasonably* diligent inspection.

Claimants' contention (ii) is essentially that Gibboney had privity or knowledge because he was present when Brian Mahoney made the verbal recommendation that the fuel tank be secured. It is true that Mahoney made this recommendation to Gibboney himself as well as to Creekmore. But this fact loses its significance

when it is remembered that at the time Mahoney made the recommendation the boat was still several weeks away from completion. The fuel tank had been merely placed in position to simulate the trim of the boat when completed. As we have indicated in our discussion of contention (i) the Judge could conclude that Gibboney had no reason to believe that the tank had not been secured as a matter of course.

In (iii) claimants contend that Gibboney is vicariously liable for the negligence, if any, represented by the erroneous Mahoney & Co. survey report. But to the extent this is really a different contention the evidence was not sufficient to meet the *Coryell* privity or knowledge test.

Claimants' contentions are without merit and we affirm the District Court's grant of limitation to Gibboney.

■ We next turn to Gibboney's assertion that he should have been granted complete exoneration from liability for the accident. His argument is that since the Wright children were only passengers aboard the LOVE MACHINE rather than seamen, his only duty to them was to exercise reasonable care rather than to furnish a seaworthy vessel. Up to this point we agree, although one might wonder how the admiralty with all of its tender concerns for life and limb would extend the duty of furnishing a seaworthy vessel to a bale of cotton but not a passenger. Gibboney goes on to assert, however, that his status with respect to the Wrights was that of a gratuitous bailor and that under common law principles, a gratuitous bailor is only under a duty to warn of defects in the property of which he is aware and is not liable for injuries occurring because of a defect of which he has no knowledge. 63 A.L.R.2d 353, 354.

The difficulty with this state local law approach is that it has been squarely rejected by the Supreme Court. In Kermarec v. Compagnie Generale Transatlantique the same argument was made and a unanimous Court replied:

For the admiralty law at this late date to import such conceptual distinctions would be foreign to its traditions of simplicity and practicality. . . . We hold that the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case.

358 U.S. at 631–32, 79 S.Ct. at 410, 3 L.Ed.2d at 555, 1959 A.M.C. at 602.

■ Gibboney owed a duty to exercise reasonable care to passengers on the LOVE MACHINE. Kermarec v. Compagnie Generale Transatlantique, 1959, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550, 1959 A.M.C. 597; Fidelity & Casualty Co. v. C/B MR. KIM, 5 Cir., 1965, 345 F.2d 45, 1965 A.M.C. 1944; Tullis v. Fidelity & Casualty Co., 5 Cir., 1968, 397 F.2d 22, 1968 A.M.C. 1451. Although any negligence on the part of Creekmore or Mahoney & Co. was not such as to constitute his own privity or knowledge of the defect, there was ample basis under familiar maritime principles to impute their negligence to Gibboney so far as liability is concerned.

Affirmed.