**Terry Nicholas COBB, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 77–50–Civ–J–M.

United States District Court, M. D. Florida, Jacksonville Division.

Feb. 26, 1979.

---

John T. Shepherd, Atty., Torts Branch, U. S. Dept. of Justice, Washington, D. C., John J. Daley, Jr., U. S. Atty., Ernst D. Mueller, Asst. U. S. Atty., Jacksonville, Fla., for defendant.

Arthur Roth, Miami, Fla., for plaintiff.

DANIEL HOLCOMBE THOMAS, Senior District Judge.

This cause came on to be heard before the Court, sitting without a jury, on January 23, 24, 1979. After hearing all the testimony and examining the evidence and being fully advised in the premises, the Court enters the following Findings of Fact and Conclusions of Law, pursuant to Rule 52(a), Federal Rules of Civil Procedure:

## FINDINGS OF FACT

As part of its findings, the Court adopts the following facts which were admitted by both parties and certified by the pre-trial judge as requiring no further proof at trial:

1. At all pertinent times, USS MEREDITH was a destroyer of the United States Navy, in full commission, commanded by Commander Stanislaus G. Dyro, U. S. Navy.

2. MEREDITH got underway from the Turning Basin, Naval Station, Mayport, Florida, on Saturday, 17 January 1976 at 0800R (8:00 a. m., Eastern Standard Time) for regularly scheduled operations with the Select Reservist Crew aboard.

3. Pursuant to MEREDITH message 081630Z JAN 76, four civilian guests were present at the invitation of the Commanding Officer for an overnight naval orientation guest cruise.

4. One of the civilian guests was CDR Harry Hart, U.S.N. (Ret.) who sponsored the three additional civilian guests, Dr. Donald K. Graham, Mr. Terry Cobb (Plaintiff herein) and Mr. Chris A. Dixon.

5. At the time MEREDITH got underway, the seas were calm, being about two feet to three feet high.

6. Sometime thereafter, but before the accident, the Commanding Officer personally passed the word over the shipwide public address system (known as the "IMC") that all hands, specifically the civilians, were to be extremely alert, that they were not to lean on life lines, and that they should walk carefully on all weather decks.

7. At approximately 0930R, two of the civilian guests, Mr. Chris Dixon and Plaintiff Terry Cobb, were being escorted on a tour of the MEREDITH by then OSSN Robert E. Nuber, a member of the MEREDITH's crew.

8. At the time the Nuber party arrived on the port main deck from the bridge, the decks were dry with no indications of heavy weather or other indications of deteriorating weather.

9. The main deck of the USS MEREDITH is a heavily-utilized, "every-day" thoroughfare for crew traffic fore and aft, and athwartships aboard ship. The regular "chow line" (where crew members await their turn to go through the cafeteria) forms in the vicinity of where Nuber and party first set foot on the main deck as they commenced their tour.

10. Thereafter, a wave engulfed the port side of MEREDITH, pouring over and through the lifeline, causing Nuber, plaintiff and Mr. Dixon to be swept off their feet and carried a considerable distance aft.

11. The force of the wave caused plaintiff to strike the foot of the ladder leading from the main deck to the 0–1 level on the port side.

12. The impact with the ladder caused plaintiff to suffer certain injuries.

13. Plaintiff, at pertinent times, was employed as an audio-visual technician at the University of North Florida. His date of birth is October 18, 1947.

The Court also finds the following facts:

14. A "freak" wave[1] engulfed the port side of the MEREDITH at approximately 10:00 a. m. on 17 January 1976.

---

1. The term "freak wave", as used herein, falls within the category of "Exceptionally High

Waves", defined at page 9, U. S. Naval Hydrographic Publication 603 (H.O.Pub. No. 603),

15. At all pertinent times, MEREDITH was a destroyer of the U. S. Atlantic Fleet in full commission with fully operational machinery, armament, and equipage, including a fully-manned radio room by which she maintained constant two-way communication with naval authorities and weather facilities ashore.

She was manned with a competent crew. She, her Commanding Officer (CDR Dyro) and other key members of her permanent crew had embarked and cruised civilian guests such as plaintiff Cobb numerous times before, under similar operating conditions, all without serious accident or incident.

16. THE FORECAST WEATHER—(prior to getting underway) The actual weather messages having long been discarded, the Court accepts the following hypothetical forecast prepared by the Fleet Weather Central, and presented by LCDR Colgan at trial,[2] without challenge, based on the generally synoptic situation and recorded data for the time frame of the accident:

JACKSONVILLE OPAREA FORECAST

1. METEROLOGICAL SITUATION AT 161200Z JAN 76 DEVELOPING LOW PRESSURE SYSTEM OVER LAKE HURON MOVING NORTHEASTWARD AT 30 KNOTS. COLD FRONT EXTENDS SOUTH–SOUTHWESTWARD FROM THE LOW THROUGH WESTERN OHIO/KENTUCKY TO NORTHERN LOUISIANA. FRONT IS MOVING SOUTHEASTWARD AT 35 KNOTS.

2. 24 HOUR FORECAST COMMENCING 179999Z JAN 76 FOR THE JACKSONVILLE OPAREA.

A. WEATHER: PARTLY CLOUDY BECOMING CLOUDY AFTER MIDNIGHT.

B. VISIBILITY: UNRESTRICTED.

C. WIND: SOUTHWEST 10 KNOTS BECOMING NORTHWEST 20 TO 30 KNOTS BY SUNRISE; WINDS 5 KNOTS HIGHER AFTER SUNRISE IN THE EXTREME EASTERN PORTION OF THE OPAREA.

D. SIGNIFICANT WAVE: CONFUSED 2 TO 3 FEET RAPIDLY BECOMING NORTHWEST 4 TO 8 FEET AFTER MIDNIGHT; BUILDING 8 TO 11 FEET IN THE EXTREME EASTERN PORTION OF THE OPAREA BY NOON.

E. OUTLOOK TO 48 HOURS: PARTLY CLOUDY, WINDS NORTHWEST 15 KNOTS, SEAS NORTHWEST 3 TO 5 FEET.

17. The accident occurred approximately 1½ hours after MEREDITH took departure from the St. Johns River Channel Entrance Buoy. Her subsequent course and speed until the accident kept her in the western portion of the operating area, within the context of the forecast.

18. There was no pre-sail information available to the Commanding Officer which should have caused him, in the exercise of reasonable care and prudence, to do anything but get underway and proceed to sea and conduct the guest cruise as scheduled.

THE ACTUAL WEATHER AFTER
GETTING UNDERWAY—UNTIL
THE ACCIDENT

19. It was stipulated that MEREDITH's main decks were completely dry when plaintiff first descended from the bridge and commenced to walk aft with fellow-guest Dixon under the direction and control of their appointed escort, OSSN Robert Nuber.

---

reprint of 1971, *Observing and Forecasting Ocean Waves by means of Wave Spectra and Statistics,* as follows:

*Exceptionally High Waves*
In any wave system, after a long enough time, an exceptionally high wave will occur. These monstrous outsized waves are improbable but still possible; hence they do happen.

They can happen at any time, and the exact time of occurrence of such an outsized wave can never be predicted.

2. LCDR Colgan's comprehensive weather and sea state analysis, including satellite photography, synoptic charts, and wave height forecast, is contained in defendant's exhibit 4.

20. No indications of deteriorating weather were observed by anyone, either from the bridge or on-deck, which would prudently require that plaintiff's planned guided tour of the main deck should be cancelled or postponed. The ship was riding comfortably with an easy motion with dry decks except for a light spray over the fantail which is a normal fact of destroyer life.

21. LCDR Colgan's Exhibit 4 contains a credible analysis of wave heights existing at the time and place of the accident in which he concluded that the surface wind was blowing from approximately 290°T at approximately 28 kt., which would put it on MEREDITH's port quarter resulting in a relative beam wind of about 16 kt., estimating also that the "significant wave heights"[3] at the time were about 4 ft.

22. The Commanding Officer did not violate his duty of reasonable care in proceeding to sea, on course 076, making turns for 22 kt. and allowing Mr. Cobb to proceed with his escorted tour of the ship.[4]

23. After being relieved from his getting-underway station, OSSN Nuber was assigned, while on the bridge, by the Executive Officer, CDR Adolph, to give plaintiff and fellow-guest Christopher Dixon a tour of the ship, the time then being about 0945, or 15 minutes before the accident. The party left the bridge and descended to the port main deck and commenced slowly to move aft, Nuber pointing out various features of the ship and explaining the equipment. The deck was then dry and there was little motion on the ship. Normal ship's routine was in effect and all hands were freely going about their business and moving about the decks. No special lifelines were necessary and no requirement for life jackets was in force.

24. After moving aft a few feet to a point approximately 4 or 5 paces forward of the water-tight door that closes the port side of MEREDITH's main athwartships passageway, plaintiff and fellow-guest Dixon stopped to chat, in the middle of the deck area. The deck was still dry, and no waves had been observed to break on the ship except for a small slug of heavy spray that came over the port fantail at least 75 ft. aft of where the party was then standing.

25. Nuber then recalls having heard the "word passed" that all hands should stand clear of the main deck or words to that effect. This was about 2 minutes prior to when the wave struck. Nuber immediately told Cobb and Dixon that they would have to clear the main deck into the shelter of the athwartships passageway, then only 4 or 5 paces aft. Nuber told them a second time, estimating the time 1 to 1½ minutes prior to when the wave struck, whereupon they started to move aft to the passageway door.

---

**3.** "Significant Wave Height" is a common oceanographic term used to define heights at a given time. It is defined at page 14, in H.O. Publication No. 603, as "the average value of the heights of the one-third highest waves in a given observation." The methodology employed by LCDR Colgan is similarly described in H.O. 603. Even to a layman the procedure used does not offend the common sense. Simply stated: ocean waves of the type experienced by MEREDITH are wind-generated, absent seismic disturbances or other abnormal circumstances. The height of such waves, at a given point at sea, obviously depends on the velocity of the wind, the time during which it blew, and the distance in miles over which it blew, the latter being known as the "fetch".

**4.** Although properly a consideration of law, the Court took judicial notice of the U. S. Navy Regulations, at 32 C.F.R. *Subpart G—The Commanding Officer,* which requires, at § 700.714 *Rules for visits:*

(a) * * *
(b) * * *
(c) Commanding Officers and others officially concerned shall exercise reasonable care to safeguard the persons and property of visitors to naval activities as well as taking those necessary precautions to safeguard the persons and property within his command.

Thus, the Commanding Officer's lawful duty towards his guests was exactly the same as required for his complement of naval personnel _ _ _ reasonable care _ _ _ a concept similarly established by the Supreme Court with respect to non-naval shipowners and guests. See *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959), about which more will be said later.

26. They did not make it. Nuber was facing aft at the time and was only conscious of a wall of water over his left shoulder—more in the form of a shadow. He speculated that it may have been as much as 10 ft. above his head, and he estimated that MEREDITH's amidships freeboard at the time was between 4 and 5 feet. The next thing he knew, after tumbling down the deck, was when he found himself up against the fantail bitts.

## PLAINTIFF'S INJURIES AND POST–ACCIDENT EVENTS

27. Plaintiff suffered painful and serious injuries to his left arm and right leg when he was tumbled into the main deck ladder.

28. He was provided post-accident first aid aboard MEREDITH and after the ship returned later in the afternoon to Mayport, was transported along with the injured MEREDITH crewmen to the U. S. Naval Regional Medical Center, Jacksonville, where he was hospitalized for 11 days, underwent one surgical procedure; was rehospitalized again in April and July 1977, during which he underwent additional surgery interspersed with out-patient consultation and physiotherapy throughout. His navy treatment was concluded in late May 1977 and the evidence is undisputed that he did not obtain or seek additional treatment from civilian sources thereafter.

29. He presently has pain in his left upper extremity and in his right leg, particularly after physical exertion. A comprehensive medical examination on 13 April 1978 at the Naval Hospital, by Captain A. L. Rehme, MC, U.S. Navy, Chief of Orthopedics, found, among other things, certain limitations in the motion of the left elbow and right ankle. Dr. Rehme's trial assessment of plaintiff's present bodily functional impairment, as a whole, is 5%; also, that the limitation in ankle motion will probably be permanent, whereas the other problems will not be permanent.

30. Extensive Navy medical records were admitted into evidence; but no record of any follow-up civilian treatment. Plaintiff admits that his Navy care was of the finest quality and that he had never been billed, or paid anything, for the same.

31. Plaintiff placed great emphasis on the fact of his inexperience aboard ship, claiming that he had not been asked about it; and further, that he had not been briefed after coming aboard that morning on shipboard safety precautions. He also claimed that he never heard any warning to clear the main deck just before the wave struck.

In light of the evidence regarding the size and sudden onset of the wave which literally engulfed the port side of the ship, there is no doubt that even the strongest man, seeing the wave coming and being fully braced with a death-grip on a lifeline, could not have withstood the tremendous force that catapulted the four men down the deck.

32. The Court finds that the wave was an unpredictable freak of nature that occurred only once. Accordingly, there was no breach of the government's duty of reasonable care towards Mr. Cobb.

## CONCLUSIONS OF LAW

1. The Court has personal and subject matter jurisdiction. Venue is well-laid.

2. This incident occurred aboard ship on the high seas and is therefore cognizable in admiralty, and requires the application of the general Federal Maritime Law.

3. Plaintiff Cobb was lawfully aboard the vessel as a non-paying guest, and therefore was not a member of the crew. As a non-crew member, he is not afforded the remedy flowing from any breach of the government's warranty of the seaworthiness [5] of USS MEREDITH. Instead, it is well-settled and agreed by the parties that the government, as embodied by the officers and crew of MEREDITH, owed him no more than the exercise of

---

5. Seaworthiness, per se, proscribes the admiralty doctrine of almost, but not quite, absolute liability. *Mitchell v. Trawler Racer,* 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960).

reasonable care. *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 630, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). See also the Navy application in *Sherman v. United States,* 283 F.Supp. 269 (E.D.Wisc.1968).[6] Accordingly, the government, as shipowner, cannot be held as the absolute insurer of plaintiff's safety while aboard.

4. The government, in consenting to suit under the Suits in Admiralty Act, 46 U.S.C. §§ 741–752, and the Public Vessels Act, 46 U.S.C. §§ 781–790, stands before the Court exactly as a private citizen, 46 U.S.C. § 742. As such, the government, regardless of its resources and power, cannot properly be judicially held to more rigorous standards than a private shipowner with respect to a shipboard guest. The standard of "reasonable care under the circumstances" is a universal and well-settled rule. *Canadian Pacific (Bermuda) Ltd. v. United States,* 534 F.2d 1165 (5th Cir. 1976), citing *De Bardeleben Marine Corp. v. United States,* 451 F.2d 140 (5th Cir. 1971). See also *Kermarec* and *Sherman, supra,* and *Branch v. Schumann,* 445 F.2d 175 (5th Cir. 1971) which specifically defines the duty: Florida law which requires highest care cannot expand the maritime law's requirement for 'reasonable care'. Similarly, U. S. Navy Regulations, 32 C.F.R. § 700.714 *Rules for Visits,* requires the same "reasonable care" standard as *Kermarec,* part (c) stating:

> Commanding Officers and others officially concerned shall exercise reasonable care to safeguard the persons and property of visitors to naval activities * * *

5. The doctrine of *res ipsa loquitur* cannot be applied. In *Irwin v. United States,* 236 F.2d 774 (2nd Cir. 1956), aff'g 111 F.Supp. 912 (E.D.N.Y.1953), the Court of Appeals affirmed the trial judge's finding that the accident was caused by an unpredictable "freak swell", stating in part:

> Even the United States is not master of the sea and wind, and the doctrine of *res ipsa loquitur* is inapplicable where the

defendant does not have control of the agency causing the accident. (Citations omitted, 236 F.2d at 776).

6. Accordingly, a careful examination of Federal decisions in "sneaker wave" cases indicates that recovery invariably has been denied, absent other negligences on the part of the vessel.

7. The matter is well summarized in *The Winnipeg,* 5 F.Supp. 469 (D.Cal.1933) in which recovery was denied for injuries caused by a sudden roll, of which there had been neither prior occurrence nor warning:

> If the ship had been making her way through a severe storm, the duty of the officers would have been entirely different * * * Certain it is that the conditions of the sea were not such as to require any particular order or warning for the safety of the passengers. (5 F.Supp. 469).

8. The proximate cause of plaintiff's unfortunate accident was a "sneaker wave" not reasonably foreseen by the officers and crew of the USS MEREDITH. Accordingly, no judgment may properly be entered against the United States on mere speculation. *Kain v. Vjazma,* 1977 AMC 415 (E.D.La.1977); *Thinguldstad v. United States,* 343 F.Supp. 551 (S.D.Ohio 1972); *Lamb v. Interstate S. S. Co.,* 149 F.2d 914 (6th Cir. 1945); and *Boston C. C. & N. Y. Canal Co. v. Seaboard Transportation Co.,* 270 F. 525 (1st Cir. 1921).

9. The complaint will be dismissed and judgment entered in favor of the United States. No costs to be taxed.

---

6. The matter was bluntly put in *Tittle v. Aldacosta,* 544 F.2d 752 (5th Cir. 1977), citing *Gibboney v. Wright,* 517 F.2d 1054 (5th Cir. 1975) that: * * * A bag of coffee beans fares better than a non-crew member fare paying passenger to whom the warranty of seaworthiness does not run. * * *