Ronald R. SMITH, Plaintiff-Appellant,

Aetna Casualty & Surety Co., Intervenor-Appellant,

v.

SOUTHERN GULF MARINE COMPANY NO. 2, INC., et al., Defendants-Appellees.

No. 85–3184.

United States Court of Appeals, Fifth Circuit.

June 11, 1986.

Terrence J. Lestelle, Lestelle & Lestelle, New Orleans, La., Kelly & Salim, Robert L. Salim, Natchitoches, La., for plaintiff-appellant.

Michael O'Brien, Lafayette, La., for Aetna Cas. & Sur. Co.

James E. Diaz, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Gary P. Kraus, Lafayette, La., for Southern Gulf Marine Co. No. 2, Inc.

Wood Brown, III, Montgomery, Barnet, Brown & Read, New Orleans, La., for Oceanic Butler, Inc.

Jones, Walker, Waechter, Poitevent & Carrere, Robert M. Contois, Jr., New Orleans, La., for McMoran Corp.

Before GEE, RUBIN and GARZA, Circuit Judges.

GARZA, Circuit Judge:

This is a slip-and-fall case brought by a passenger of a crewboat transporting workers to a platform off the Louisiana coast. The plaintiff, Ronald R. Smith ("Smith"), a crane operator employed by Zapata Off-Shore Company ("Zapata"), sued the vessel owner, Southern Gulf Marine Company No. 2, Inc. ("Southern Gulf"), and two other parties, Oceanic Butler, Inc. ("Oceanic") and McMoran Offshore Exploration Company ("McMoran"). McMoran had contracted with Zapata to conduct drilling operations on one of its permanent platforms located in the Gulf of Mexico and Oceanic had contracted with McMoran to provide catering services on the platform. Aetna Casualty and Surety Company, as compensation insurer for Zapata, intervened on the side of Smith claiming reimbursement for compensation and medical expenses paid to him.

The case was tried to the court, at the conclusion of which the court denied Smith recovery. We affirm in part, reverse and render in part, and remand for a determination of damages against Southern Gulf.

## FACTS AND PROCEDURAL HISTORY

On the morning of January 26, 1983, Smith and other platform personnel were scheduled to depart by helicopter to the McMoran platform. The helicopter attempted to transport the relief crew, but because of inclement weather returned to base and the flight was cancelled. Rather than wait for the weather to clear up, a McMoran supervisor on the platform ordered the relief crew to be brought out by the M/V GREAT SOUTHERN, a crewboat owned and operated by Southern Gulf and chartered to McMoran. The captain of the ship determined that the voyage could be made safely despite the adverse weather conditions.

The M/V GREAT SOUTHERN was a one hundred foot long vessel, about twenty-five feet wide, with a draft of about six feet depending on her load. On this particular voyage she was manned by Captain Owens, an assistant captain, an engineer, and a deckhand. She was carrying about eighteen or nineteen workers to the platform and during the trip, due to the stormy weather, they were required to remain in the passenger compartment.

Obviously in anticipation of a rough trip, the deckhand distributed plastic garbage bags to the passengers in case they became seasick. The captain was aware that people who were not used to being on rough seas were likely to become ill. Although some seasickness medication (dramamine) may have been available, none was provided to the passengers during the voyage. Also, apparently not everyone received a garbage bag or knew they were available.

As expected, many of the passengers became quite ill and put their garbage bags to good use. Smith testified that he felt seasick but not enough to throw up, and that he gave his garbage bag to a fellow passenger who did not have one. There was conflicting evidence about the availability of a toilet for the passengers. The one most accessible to the passenger compartment was out of order but Smith testified that, after inquiring, the captain directed him to a toilet located in the bow of the boat.

When the vessel arrived at the platform around midnight, Smith was one of the first passengers to be off-loaded by the personnel basket because he was scheduled to relieve the crane operator. As he left the passenger cabin, Smith took one or two steps when suddenly he slipped and fell. He had been looking up to the platform to see if the personnel basket was descending. After his fall, however, Smith realized that he had slipped in vomit, which he could now see on the deck and smell on his clothing. No one else saw Smith fall.

Following his fall, Smith boarded the platform and carried out his duties as crane operator. Although his back bothered him considerably, Smith worked his regular shifts for the next three days. On the fourth day, Smith suffered a second accident, which occurred when his foot slipped off of a tank valve he was trying to open, and which accentuated the pain in his back and leg. Smith told the toolpusher about his increasing back pain and asked to go in for a medical examination.

After many months of treatment and rehabilitation Smith eventually had to undergo surgery. Even after surgery, however, Smith's back could not be fully rehabilitated and Smith was advised to seek another vocation because he would no longer be able to work offshore.

Smith sued in federal court pursuant to the court's admiralty and maritime jurisdiction. He asserted that the defendants, Oceanic, McMoran, and Southern Gulf were jointly and severally liable to him for injuries incurred when he slipped on the deck of the ship. Specifically, Smith claimed that Southern Gulf breached its duty to either warn him of the vomit on the deck or to have cleaned it up and provided him safe disembarkation from the ship. Smith faulted McMoran for making an unreasonable decision to transport the relief shift by crewboat in turbulent weather, and he claimed that Oceanic was vicariously liable to him because the vomit on which he slipped was the product of an Oceanic em-

ployee, one Troy Hutchinson, who had a duty to warn either the ship's crew or the other passengers of the mess he had made. The court ruled in favor of all three defendants.

## OCEANIC BUTLER

■ In regard to Oceanic, the district court found that it did not need to decide what duty a passenger who creates a dangerous condition has to report the condition because the evidence in this case was insufficient to establish the identity of the person who vomited outside the door of the passenger compartment. Hutchinson admits that he was quite seasick during the trip but claims that he vomited outside of the passenger compartment over the railing of the ship, and not on the deck. Other testimony indicates that Hutchinson threw up after Smith had left the ship.

The district court determined that the evidence about when, where, and how Hutchinson threw up was conflicting. Moreover, so many other passengers were seasick, a finding of vicarious liability against Oceanic would be based, at best, only on speculation. Our review of the record does not leave us with the definite and firm conviction that the court committed factual error and we affirm the ruling of the district court in regard to Oceanic.

## McMORAN

■ We also affirm the court's ruling in favor of McMoran. Smith sought to prove that McMoran was responsible for the decision to transport the relief workers by crewboat in rough weather and was therefore also responsible for any consequential injuries that occurred. The ultimate decision about whether to proceed, however, rested with the crewboat captain, an employee of Southern Gulf, not of McMoran. McMoran requested the alternative travel arrangement, but it could not override the judgment of the crewboat captain about the risk of making the trip. Moreover, as the court found, the decision to proceed by crewboat was not unreasonable.

## SOUTHERN GULF

Finally, in regard to Southern Gulf, we reverse and render judgment for Smith and remand for an assessment of damages. The district court found that "all reasonable measures were taken by the vessel owner to ensure Smith's safety and, considering all existing circumstances, it was not negligent for the vessel to proceed with the voyage under the weather conditions then existing." The court also found that "the Plaintiff failed to satisfy his burden of proving that the shipowner knew or had reason to know of any unreasonably dangerous condition existing at the time Plaintiff left the vessel." Smith contends that the court applied the wrong standard of care and erred in not finding Southern Gulf liable. We agree that Southern Gulf should have been held liable.

The United States Supreme Court has held that under maritime law "the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." *Kermerac v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632, 79 S.Ct. 406, 410, 3 L.Ed.2d 550 (1959). *Kermerac* sought to clear away the tangle of common law concepts pertinent to the duty of care owed to invitees and licensees on land from the duty of care owed to passengers on a ship. It rejected the use of a conceptual framework based on the duties of owners and occupiers of land as adaptable to the peculiar needs of maritime activities. *See* 358 U.S. at 630–32 & nn. 7–10, 79 S.Ct. at 409–10 & nn. 7–10. Instead, *Kermerac* created a standard of "reasonable care under the circumstances of each case."

In this Circuit, the standard of care owed to passengers on a ship, including their embarkation and disembarkation, has variously been stated as a "high degree of care,"[1] as a "duty ... of ordinary care,"[2]

---

1. *McCormick Shipping Corporation v. Stratt*, 322 F.2d 648, 648 (5th Cir.1963); *Porche v. Gulf Mississippi Marine Corporation*, 390 F.Supp. 624, 632 (E.D.La.1975) (citing *Isham v. Pacific Far*

*East Line*, 476 F.2d 835, 837 (9th Cir.1973); *Stewart v. George W. Davis & Sons, Inc.*, 340.

2. See *infra* note 2 on page 420.

as a "reasonably safe means" of boarding and leaving the vessel,[3] as a duty of "reasonable care",[4] and as a "duty of reasonable care under the circumstances."[5] Despite the various formulas enunciated in these cases, a review of the facts and the stated standards of care shows that shipowners, relatively speaking, are held to a high degree of care for the safety of passengers.

In *Tittle, supra,* for instance, a passenger aboard a charter fishing boat sustained injuries as she was disembarking from the ship and slipped on the ship's transom, striking her back against the dock. Although we implicitly adopted the district court's standard of "ordinary care" in *Tittle,* we reversed the court's judgment in favor of the shipowner and rendered judgment in favor of the injured passenger. We noted that the shipowner implemented a variety of procedures to prevent accidents such as this one. The owner was aware of numerous non-skid devices that he could have placed on the transom, but chose to use towels instead, and the mate was under orders to have these in place as the ship was coming in to dock. On this occasion, however, the mate was busy with other chores when the passenger tried to disembark. We rejected the district court's conclusion that the absence of the precautionary towel was not negligent.

In *McCormick Shipping, supra,* a passenger on a ship was injured when a small closet door with a defective lock swung open and the passenger fell against it, injuring her head. We held that, though not an insurer, a shipowner is bound not only by what it actually knows, but by what it should have known as well. We affirmed

the district court's holding that an inspection of the ship would have revealed the defective lock which would, or should, have been repaired. We stated that "[a] reading of the record convinces us that the evidence was ample to sustain the charges of negligence and the fact of substantial injury." 322 F.2d at 648.

In *Cobb v. United States,* 471 F.Supp. 102 (M.D.Fla.1979), Cobb was injured on board a United States Navy destroyer when a "freak wave" struck the ship. The district court held that the government was not liable to Cobb. After noting that the standard of care owed by the government to Cobb was the same as that of a private shipowner to his passengers (reasonable care under the circumstances) the court held that the "sneaker wave", which was the proximate cause of Cobb's injuries, was not reasonably foreseeable by the officers and the crew of the ship.

And in *Stewart, supra,* a passenger sued the owner of a deep-sea fishing vessel for injuries he suffered to his hand when he attempted to tag a flopping fish. Crew members were under orders to mark and string the catch of each passenger. The fish were tagged with a metal roofing disc attached to the string, which the vessel owner recognized as a possible hazard to the passenger. Aware of the likelihood of harm that the metal tags presented to an inexperienced fisherman, the defendant believed it necessary that only crew members should perform this task. The ship-owner was also aware that passengers would attempt to mark their own catch when fishing was good, despite instructions to the contrary. The court found that the ship-

---

F.Supp. 643, 645 (N.D.Fla.1972); *see also* M.J. Norris, The Law of Maritime Personal Injuries §§ 36–38 (3d ed. 1975).

**2.** *Tittle v. Aldacosta,* 544 F.2d 752, 755 (5th Cir. 1977).

**3.** *Id.; Callahan v. Cheramie Boats, Inc.,* 383 F.Supp. 1217, 1220 (E.D.La.1974).

**4.** *Gele v. Chevron Oil Company,* 574 F.2d 243, 248 (5th Cir.1978); *Gibboney v. Wright,* 517 F.2d

1054, 1059 (5th Cir.1975) (citing *Kermerac, supra*).

**5.** *Dove v. Belcher Oil Company,* 686 F.2d 329, 333 (5th Cir.1982) (citing *Gele, supra* and *Gibboney, supra*); *Cobb v. United States,* 471 F.Supp. 102, 107 (M.D.Fla.1979) (government is judicially held to same standards as private shipowner with respect to shipboard guests, such care being that of reasonable care under the circumstances).

owner had failed to provide adequate safeguards to prevent such foreseeable injuries, including a larger and more experienced crew, if necessary, to meet the degree of care owing to the passengers. 340 F.Supp. at 645.

Outside of this Circuit, in *Rainey v. Paquet Cruises, Inc.*, 709 F.2d 169 (2d Cir. 1983), the Court reasoned that "[t]he extent to which the circumstances surrounding maritime travel are different from those encountered in daily life and involve more danger to the passenger, will determine how high a degree of care is reasonable in each case." *Id.* at 172. *Rainey* involved a suit by a passenger against a shipowner for injuries sustained when she tripped over a stool that was on the dance floor in the ship's discotheque. In dismissing the case, the court reasoned that this was not the type of injury "usually associated with a ship at sea", that the plaintiff presented no evidence connecting any movement of the ship or conduct of its crew to the presence of the stool on the dance floor, and that, under the standard of care enunciated in *Kermerac, supra,* the carrier could not be held negligent. The passenger appealed, contending that the court failed to apply a higher degree of care than that of "reasonable care under the circumstances".

■ We agree with the Second Circuit's analysis that, "[i]n some instances reasonable care under the circumstances may be a very high degree of care; in other instances, it may be something less." *Rainey,* 709 F.2d at 171. *McCormick Shipping, supra, Tittle, supra, McCormick Shipping, supra, Cobb, supra, Stewart, supra,* and other similar maritime cases [6] reflect the application of this principle. We realize that the standard of care in cases of maritime negligence involving passengers has been paraphrased in different ways by different courts since *Kermerac.* However, we will not further confuse the matter by attempting to fashion a more "precise" standard. Rather, we shall continue to ad-

here to the standard enunciated in *Kermerac,* that a shipowner owes to passengers the duty of exercising "reasonable care under the circumstances of each case." 358 U.S. at 632, 79 S.Ct. 410. The circumstances here include, inter alia, the experience of the crew, the type of carrier involved, the dangers to the passengers peculiar to that type of carrier, the carrier's degree of control over the passengers, and the carrier's ability to take precautions against such dangers.

We have no difficulty rendering judgment for Smith based on the record of this case. Although the captain of the ship made a reasonable decision to undertake this trip despite bad weather, the risk of danger to the passengers was certainly greater and, consequently, the duty of the crew to attend to the comfort and safety of the passengers was, quite reasonably, heightened. Moreover, various measures to do so were taken. Garbage bags were passed around in anticipation of seasickness, although possibly not enough were made available. The passengers were not allowed on the deck of the ship or to leave the passenger compartment until told to do so by the captain or the crew. Upon arriving at their destination late at night, the seas were still rough, and the disembarkation of the passengers was riskier than it would have been during the day and in clearer weather. Also, throughout the trip the passengers had no ready access to toilet facilities. The head most accessible to the passenger compartment was out of order and the passengers were apparently unaware of another head in a different part of the ship. The lack of available toilets was not negligence, but it is one of the circumstances relevant to the crew's awareness that passengers may have vomited in places other than in the garbage bags.

In its Opinion and Order, the district court found "that the Plaintiff in fact slipped and fell on vomitus which was on

---

**6.** *See* M.J. Norris, *supra* note 1.

the steel plate next to the door," injuring his back.[7] In a different part of its opinion, the court found, nonetheless, that Smith failed to prove that the vessel owner had "actual or constructive knowledge of a hazardous condition," and held that there was "no evidence explaining the duration of the presence of the vomit nor any reason that would have compelled the vessel owner to have cleaned the area." The dissent points out that this language of the court is meant as a factual finding or findings (despite its phrasing and location among the conclusions of law) which we can not set aside unless clearly erroneous. To the extent that it is a factual finding, we find it clearly erroneous. To the extent it is a legal conclusion, we hold it to be legal error.

█ It is true that how the vomit got on the deck in front of the door to the passenger compartment was never established, but the lower court unequivocally found that the vomit was there, and it created a slippery and dangerous condition on the ship. There is no evidence to excuse the crew of the M/V GREAT SOUTHERN from not having discovered the vomit before asking the passengers, including Smith, to come out of the passenger compartment and disembark. Regardless of how long the dangerous condition existed, the question is simply whether Southern Gulf should have discovered it at the time the passengers were about to disembark. We hold in the affirmative.

AFFIRMED IN PART, REVERSED AND RENDERED IN PART, AND REMANDED.

GEE, Circuit Judge, concurring in part and dissenting in part:

I concur fully in most of the Court's opinion, with especial enthusiasm for my Brothers' refusal to import landslide "degrees of care" aboard ship. I would, however, affirm as to Southern Gulf as well and must therefore differ with the Court's holdings in this respect alone.

Toward the close of its opinion, the trial court observed:

The court finds that the plaintiff failed to satisfy his burden of proving that the shipowner [Southern Gulf] knew or had reason to know of any unreasonably dangerous condition existing at the time plaintiff left the vessel. There has been no evidence explaining the duration of the presence of the vomit nor any reason that would have compelled the vessel owner to have cleaned the area. In other words, plaintiff has not proved the vessel owner's actual or constructive knowledge of a hazardous condition.

Accordingly, the court finds that the captain and crew of the M/V GREAT SOUTHERN were not negligent in providing plaintiff a means of egress from the vessel.

Despite its phrasing ("no evidence") and location (among the conclusions of law), this passage seems to me clearly meant as a fact finding or findings. If it is, we should not set it aside unless it is clearly erroneous. Rule 52, Federal Rules of Civil Procedure. I do not think it is, hence I respectfully dissent.

---

7. As mentioned previously, Smith suffered another injury during his work shift, which may have aggravated his back even more. We, of course, express no opinion on the extent of injury to Smith's back from his fall on the ship. Determining the extent of damages is a task best left to the district court on remand.