**In the Matter of the Petition of CATALI-NA CRUISES, INC., as owners of the motor vessel "Catalina Countess" for exoneration from, or limitation of, liability.**

No. CV 94–5444 AAH (JGx).

United States District Court,
C.D. California,
Western Division.

June 27, 1996.

---

Wilner, Klein & Siegel, Walter Klein, and Joshua Bereny, Beverly Hills, CA, for Petitioner Catalina Cruises, Inc.

Steven Unger, Law Offices of Steven H. Unger, Beverly Hills, CA, for Claimants Tyrone Young, Alex Heidharian, Kamran Heidharian, Megashia Jackson, Darryl King, Ana Munoz, Jan Tsjioe, Elisa Ugarte, Joe Yuan, and Kevin Young.

Milberg & De Phillips, William A. Skoog, Jr., Cardiff by the Sea, CA, for Claimant Valerie A. Jordan.

Law Offices of Jose Urcis, Santa Ana, CA, for Claimant Julie Luna.

Schlossberg and Krzemuski, Andrew Krzemuski, Beverly Hills, CA, for Claimants Cleveland Washington, Toni Washington.

Lewis, Marenstein, Wicke & Sherwin, Thomas L. Hoegh, Woodland Hills, CA, for Claimant Wayne Laird.

Law Offices of Jeffrey Allen Goldman, Los Angeles, CA, for Claimant Bartolome Alcala.

Howard Krepack, Gordon, Edelstein, Krepack, Grant, Felton & Goldstein, Los Angeles, CA, for Claimant Lisa Bolton.

Mallory & Brown–Curtis, George L. Mallory, Jr., Los Angeles, CA, for Claimants Monique Brown, Sylvia Brown, Dawn Dyer, William Groves, Edward Pierce, Melony Pierce, Anthony Tidwell, James Tolbert, Sharon Washington, Caprice Winstead.

Landgren & Belz, David L. Belz, and Mary Luetto Nichols, Laguna Niguel, CA, for Claimant Luke Brunet.

Wise, Wiezorek, Timmons & Wise, Anthony Wiezorek, Richard Dieffenbach, and Steven C. Rice, Long Beach, CA, for Claimants Dena Deck and Kirsten Deck.

Clara Hill–Williams, Law Offices of Johnnie L. Cochran, Jr., Los Angeles, CA, for Claimant Adolphus Edmond.

## OPINION, DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

HAUK, District Judge.

### Introduction

This action is brought by Petitioner, Catalina Cruises, pursuant to the Limitation of Liability Act, 46 U.S.C. § 181 et seq. and Federal Rules of Civil Procedure Supplemental Rule F for Certain Admiralty and Maritime Claims. Under the Limitation of Liability Act (the "Act") and Rule F, a shipowner facing liability to someone arising out of alleged negligence during a voyage may petition the court "for exoneration from liability or limitation of liability to the value of the ship itself." *Matter of Hechinger*, 890 F.2d 202, 206 (9th Cir.1989). The court may then enjoin Claimants from filing individual suits and require them to file all claims in the limitation proceeding. *Id.* The court then

determines whether the shipowner is liable to any of the Claimants and, if so, whether liability is limited to the value of the vessel. *Id.*

The shipowner in this case has posted a $900,000 bond, the value of the vessel. This Court, after bifurcating the issues, proceeded to a non-jury trial on the issue of liability *vel non*, reserving the issue of damages for a separate non-jury trial. Now the Court, in this Opinion and Decision, renders the verdict on liability.

### Issues

1. Was it reasonable for Captain Martin to travel from Catalina to Long Beach on Sunday, April 24, 1994? Should Captain Martin have returned to the safest harbor once he noticed the weather conditions deteriorating?

2. Was the Catalina Countess adequately prepared and equipped for the trip from Catalina to Long Beach given the prevailing weather conditions?

### Procedural History

On August 10, 1994, Catalina Cruises petitioned the Court for exoneration from liability under the Limitation of Liability Act. This petition was filed on the ground that the injuries sustained by passengers of the Catalina Countess resulted from a "rogue" wave, which is a peril of nature or an act of God for which Petitioner cannot be responsible. On August 11, 1994, Magistrate Groh signed an Order Directing a Monition[1] and Granting a Restraining Order. The Order provided that Notice and Monition be issued to all Claimants in the matter. Claimants were directed to file their claims with the Court by October 10, 1994. Thirty-two Claimants filed, contending that Catalina Cruises negligently operated the vessel at an unsafe speed and in unsafe weather conditions.

On July 24, 1995, the Court granted Petitioner's unopposed motion to bifurcate liability and damages. On March 25, 1996, the Court heard argument concerning Petitioner's Motion for Summary Judgment. Petitioner contended that it was not negligent in its operation of the Catalina Countess on

April 24, and that the casualty was the result of a "rogue wave" which could not have been predicted or avoided. Using this reasoning, Petitioner argued that it should not be held liable for damages or injuries caused by an unpredictable peril of nature or act of God.

Claimants successfully argued that their allegation of negligence could not be eliminated by a motion for summary judgment because there were too many genuine issues of material fact associated with the negligence claim. The Court conceded this and determined that a trial was necessary to ascertain what was reasonable under the time, place, and circumstances on April 24, 1994.

The Court Trial on the liability phase began on May 21, 1996 and continued *sine die* until June 5, 1996. Before the trial started, the Court laid out the issues to be determined as: 1) whether it was reasonable for Captain Martin and the Countess to travel from Catalina to Long Beach on April 24, 1994; 2) whether the vessel was properly equipped for the voyage on April 24, 1994; and 3) whether Captain Martin should have turned back toward Catalina once the weather started to significantly deteriorate. The Court also indicated that testimony during this phase of the trial would be limited to the weather, the weather forecasts for April 24, 1994, the preparations and preparedness of the Catalina Countess, and the actions of the Captain and the crew. At that time, the parties did not voice any objections to the outline of issues or the outline of evidence that would be considered.

On May 28, 1996, the fifth day of trial, Petitioner raised a concern about which phase of the trial would address causation. Petitioner contended that causation should be addressed in the liability phase of the trial because negligence would not exist if the actions of the Captain and the crew of the Countess were not the proximate cause of Claimants' injuries, if any. Claimants argued that causation should be addressed during the damages phase because it would be during this phase that each Claimant would be required to demonstrate a causal link

1. Monition is defined as "an official or legal notice." *See* Webster's New World Dictionary 877 (3d. College Edition 1988).

between the actions of the Captain and the crew and their individual damages. The Court, in light of the issues delineated at the beginning of the trial, determined that causation would be addressed during the damages phase.

### Findings of Fact

Petitioner is the owner of the M/V[2] Catalina Countess, a 127 foot, 97 gross ton passenger vessel, inspected and certified by the Coast Guard, operating between Long Beach, California and Catalina Island. The Catalina Countess is certified to carry a maximum of 793 passengers. The vessel consists of an enclosed main deck; a number one deck which consists of an enclosed portion and an open, unprotected portion; and an open number two weather deck. Within the enclosed main deck and the enclosed number one deck, passengers can sit on benches attached to the perimeter of the vessel, or they can sit in chairs that are not secured to the deck. Passengers' luggage is stored between two red canvases suspended from stainless steel posts, but it is not secured in any way to the deck.

On April 24, 1994, the Catalina Countess was under the command of Captain Donald Martin, an experienced vessel "master" or "operator" who had been licensed by the United States Coast Guard for 30 years. That morning, he reported for work as usual, prepared the vessel for the crossing, and checked the weather. The NOAA[3] marine weather forecast for April 24, 1994, actually prepared the day before, was winds from the west to northwest, 15–25 knots, seas 5 feet and swells from the west at a height of 5 feet. The marine weather forecast for the morning of April 24 called for a small craft advisory[4], and the Mate, Second in Command, Denny Dennis, noted that it was windy with large sea conditions.

The Catalina Countess left Long Beach at approximately 9:00 a.m. The vessel arrived in Avalon at 10:55 a.m., and all passengers disembarked. The Countess then made its way north along the Catalina coast to Toyon Bay, where 121 passengers came aboard. These passengers, campers and their chaperons, had been attending the Catalina Island Marine Institute and were heading back to their mainland homes.

At 11:55 a.m., the vessel began its trip back by returning to Avalon. Mate Denny Dennis met with the chaperons to inform them and their charges that the crossing would be "rough." This meeting was conducted at the direction of Captain Martin who could see that the whitecaps in the Channel were more prevalent than they had been in the morning crossing, indicating a significant increase in wind speed. The vessel arrived back in Avalon at approximately 11:35 a.m., and 198 additional passengers boarded. It is interesting to note, Captain Martin did not contact the Harbor Master in Avalon for late and up-to-the-minute weather reports prior to leaving Avalon. The Countess began its return trip to Long Beach at approximately 12:25 p.m. The "small craft advisory" was still in effect.

Captain Martin, in an effort to "make the ride more comfortable for the passengers", sailed north up the coast of Catalina, once again toward Long Point. This route allowed the Countess to travel in the lee of the island until, by executing a turn to the right or starboard, Captain Martin could "get a bite on the swell" and travel "downhill" with the swell, as he put it. The lee of an island is the sheltered side or area that is protected from the wind or sea. McEwen & Lewis, ENCYCLOPEDIA OF NAUTICAL KNOWLEDGE, Cornell Maritime Press (1992). It was his intention to keep the wind, waves, seas and swell[5]

2. M/V is the maritime designation for a motor vessel.

3. NOAA stands for the National Oceanic and Atmospheric Administration.

4. Expert testimony at trial indicated that a "small craft advisory" advises of possible winds at speeds of 18 knots or greater. Testimony further revealed that a "small craft advisory" is a warning not restricted to mariners operating small vessels but is one that should be considered

and evaluated by all mariners in ascertaining ocean traveling conditions. In actuality, a "small craft advisory" has nothing to do with the size of the vessel and is not limited to "small craft", but is put out in a forecast to be heeded by every vessel plying the water between Catalina and the mainland.

5. For the purpose of clarifying these terms, it is helpful to define them in mariner's parlance. "Wave" refers to the undulation of the sea surface. Usually the period range for waves is 1–20 seconds. The period is the time distance be-

primarily on the aft port quarter, resulting in a more comfortable ride for the passengers than the direct course from Avalon to Long Beach. At 12:45 p.m., the Countess was approximately one and one-half miles off Long Point. It was then that Captain Martin began to execute the right turn to head for the mainland. Captain Martin was at the helm of the vessel until he had gone through this right hand turn that would take the vessel on a course to the "Queen's Gate" entrance in the Long Beach Breakwater. Denny Dennis thereupon took over from Captain Martin, and followed the course he had set.

Before the Countess had cleared the lee of the island, Denny Dennis had been in radio communication with the captain of a passing sister ship, the Catalina Monarch, which was on its way to Avalon, having left Long Beach at 12:00 with no passengers. The captain of the Monarch informed Dennis that the ride from Long Beach had been miserable, relating that the Monarch had, mid-channel, experienced winds from the west at 30–35 knots and heavy seas and swells from the west at 8 to 12 feet high. Captain Martin testified that Denny Dennis, for some reason, did not relay this information to him. The Court notes that Captain Martin also testified that Dennis' failure to so do was not good seamanship.

The weather conditions on this return trip of the Countess were such that the wind was blowing at a speed of 25–30 knots from a West, Northwest direction, with occasional gusts of up to 35 knots, and waves about 5 to 7 feet could be seen breaking against the vessel. Despite the fact that Captain Martin was not monitoring the NOAA weather channel the entire trip,[6] he observed that the weather conditions had significantly deteriorated from those seen during the morning crossing. Denny Dennis testified it was very windy and that the swells were almost on the beam of the vessel, making it roll at angles from 20 to 30 degrees.

The broken window incident occurred as the Countess was entering the relatively shallow water off Long Beach, an area designated on maps as the "precautionary zone." Petitioner presented expert testimony regarding the characteristics of the waves in the area in which the incident occurred, this area being part of the Southern California Bight. Dr. Flick, an oceanographer with Scripps, testified that the Southern California Bight is unique in that the contour of the ocean floor is complicated. Waves entering the Bight are then heavily affected by the ocean floor topography. One effect this topography has is known as "bottom contour focusing." When a wave reaches a particularly complicated contour area, it is amplified in height and magnified in force, the contour acting as a lens focusing the energy of the wave. While Captain Martin may not have known the science involved in the wave amplification, he had traversed the Channel enough times that he should have known that large waves were suddenly possible in the area.

Several Claimants testified that the vessel was experiencing bad rolls for approximately thirty minutes before the huge wave struck the vessel and broke the window. The waves that were breaking on the vessel ranged in estimated height from 5 to 10 feet. At about 1:30 p.m., a set of larger and more violent swells descended upon the beam of the Countess causing the vessel to roll several times to port so severely that the main cabin windows on the port side were submerged, and the number one weather deck was leaning into the water, less than 8 feet above the water rather than its usual 16 feet. A larger wave then struck the Catalina Countess broadside.

Passengers seated on the number one weather deck were washed from their seats, the force of the water carrying them across the deck. These passengers were thrown into other passengers and into fixtures on the

---

tween wave crests. "Swells" originate from distant sources and tend to have a period range of 8–30 seconds. Lastly, "seas" are generated by local weather phenomena and have a period range of 1–8 seconds. These definitions were testified to by Commander Ide, Captain Janecek, Captain Stoller, and Dr. Flick.

All of these sea conditions may exist in one area and may combine to cause a confused sea

state. Moreover, these terms, as their definitions suggest, are not precisely defined because of the overlap that does exist.

6. Captain Martin admitted that he could not have known if there was any change in the NOAA forecast because he only listened to the weather channel one time after. leaving Long Point, and did not keep a continuing watch on it.

deck. Several Claimants testified that as the shock of the incident wore off, they realized that they were sitting on the deck in approximately three feet of water.

The impact of this wave also shattered a glass window on the port side of the main deck, just forward of the port exhaust stack, resulting in some passengers being washed out of their seats and sustaining a variety of cuts, bruises, alleged "soft tissue" injuries, and emotional and other psychic injuries. As the swell passed under the port side of the ship, the vessel lurched hard back to starboard, throwing a number of passengers not struck by the water onto the deck and launching those who were seated on to the deck. More particularly, Sylvia Brown, a Claimant who had been a paraplegic since she was 14, was unexpectedly knocked out of her electric wheelchair, unable to get up and back in the chair without help from strangers among her fellow passengers. Unsecured items, glass, chairs and luggage were hurled about.

At approximately 1:40, Captain Martin, who had 10 minutes earlier relieved Denny Dennis at the helm, received a call from Bray, a deckhand. This was to alert him that a window on the main deck had been shattered, and some passengers had been injured. Captain Martin immediately reduced the speed of the vessel, obtained a first aid kit, turned the helm over to Denny Dennis, and went down to the main deck to survey the damage and administer first aid. However, at no time did Captain Martin make a public announcement, as mandated by the Catalina Cruises' Master's Information Guide, asking for the assistance of any doctor, nurse, or other medical personnel who might have been on board.

Approximately 10 minutes later, while in the midst of surveying the passenger decks, Captain Martin radioed Dennis and instructed him to alter course so that the vessel would be headed in a more easterly direction. This alteration put the seas almost directly on the stern which immediately alleviated the severity of the rolling, with the result that the ride became much smoother. Dennis was also instructed to notify VTIS (Vessel Traffic Information Systems) that the casualty had occurred, with the word that paramedics were needed and should meet the vessel to attend to the injured passengers. However, Dennis did not notify the Coast Guard as required by its regulations, and Captain Martin admitted that notifying VTIS does not strictly comply with a specific regulation, 46 CFR § 4.05–1.

Captain Martin then radioed Dennis a second time, directing him to turn toward the east end of the Federal Breakwater in Long Beach at full speed. As Dennis obeyed, Captain Martin realized, at that flank speed, water continued to gush in through the damaged window, even though the deckhands had boarded it up. Moreover, the vessel was taking an additional and unnecessary pounding, so Captain Martin instructed Dennis to reduce speed again.

Once inside the east end of the Federal Breakwater in Long Beach, the Countess was boarded by paramedics who assisted in administering first aid. Two Coast Guard investigators were at the dock when the vessel arrived. Lieutenant J.G. MacGregor, with the Marine Inspection Office, became the primary Coast Guard Officer in charge of the investigation which lasted seven hours.[7] She then prepared a lengthy Preliminary Report which was submitted to Commander Rennard, her immediate supervisor. This Preliminary Report was based upon her examination of the vessel, study of the weather conditions in the Channel that day, analysis of the Catalina Countess' log,[8] and interviews

---

7. The purpose of such a Coast Guard investigation is not to affix liability as between private litigants, it should be emphasized.

8. Unfortunately, the log kept by Captain Martin is not especially helpful in determining the information relayed to the passengers during the trip, nor is it particularly detailed with respect to the actions taken by the crew once the casualty occurred.

The log does indicate the departure and arrival times at the various locations where the Countess stopped to load and unload passengers on April 24, 1994. The remarks section of the log contained the following information:

"Bowen—add to clean up—
1340 Injury Report—Damage Report
Office Notified
★ Ran t. Long Point Reduce Speed
Weather 30 k WNW Swell
Shattered Port Window P.S.C. 025°—speed 11k
Parameds on board
1445—see reports—"

**1390**

with the Captain, the Mate, and some of the passengers.

In connection with this investigation and eventual Final Report, the Coast Guard had access to the logs of the other vessels traversing the Channel that day. It was aware that two vessels, the Catalina Express and the Catalina King, had cancelled their afternoon runs because of bad weather; and further that one other vessel, the Super–X, returned to San Pedro after discovering that the weather conditions were too fierce to risk crossing the Channel. However, these facts are not contained anywhere in any Coast Guard report, whether Preliminary or Final.

Lt. MacGregor, in her Preliminary Report, *did* recommend that the Coast Guard consider adopting more stringent standards for windows on vessels of the Countess-class. These standards, she suggested, should include limiting the size and area of the glass in the windows, increasing the thickness of the glass, reinforcing the framing and the material used to retain the glass in the frame, and utilizing wire mesh to further strengthen the glass. She also recommended that the Officer in Charge of Marine Inspection ("OCMI") consider restricting the operation of this vessel and her sister ships depending upon weather conditions. These recommendations were considered by Commander Rennard [9] but were withdrawn from the Final Report, when it was validated and

dated by Commander Rennard on July 14, 1994.

The Final Report fixed the location of the incident as latitude/N 33–36.5 and longitude/W 118–12.5. These coordinates were determined by utilizing the information conveyed to VTIS by Mate Dennis at Captain Martin's direction. Assuming that these coordinates are correct,[10] the accident occurred approximately 14.5 miles from Long Point, the landmark where the vessel made the turn toward the mainland. The vessel clearly had to be travelling at a dangerous speed in excess of 14 knots, even 15 knots or flank speed, when the incident occurred.[11] The Final Report concluded that the casualty was the result of a "rogue wave" estimated to be 10–12 feet high. The Coast Guard's findings were that the wave broke on the vessel, and the window "gave way." The Coast Guard noted that injuries were suffered by passengers on the main deck who happened to be in the path of the wave and the flying glass, even though a majority of the injuries were suffered by passengers knocked into other passengers and fixtures on the deck by vessel movement, not only there on the main deck but on the number one weather deck as well.

The Coast Guard determined that the pre-casualty weather conditions were "winds from 280° True" at a speed of 20 knots. Waves were estimated to be 5 feet and the swell height 7 feet. The swell was coming from "285° True."[12] Post-casualty weather

---

Furthermore, the log indicates that at 1015 the winds were from the WNW at 25 knots. The seas were also from the WNW at a height of 2–5 feet, and the swell was from the SW at a height of 5–7 feet. At 1330, Captain Martin logged the same weather conditions except that the seas were to be 4–6 feet, as he observed them.

9. Commander Rennard testified that the recommendations were withdrawn in a conference with Lt. MacGregor after he had consulted naval architects and reviewed documentation on construction of the vessel. Rennard was satisfied that the Coast Guard had addressed these questions in the past, and there was no practical reason to resurrect them, so they were deleted from the Final Report.

10. The Court is required to assume that these coordinates are correct because Captain Martin did not fix the vessel's position every one-half hour as required by Catalina Cruises Master's Information Guide. Captain Martin testified that vessels the size of the Countess do not need to follow this requirement. However, had Captain

Martin fixed the vessel's position and logged it in, the Court could have had a more accurate estimate of the location of the casualty.

11. The speed of the vessel is determined by taking the distance travelled and dividing it by the time required to travel that distance. In this case, at 12:45, Captain Martin was approximately 1.5 miles off Long Point when he began the turn toward the mainland. The accident occurred 14.5 miles off Long Point at 1:40. Because the vessel was 1.5 miles off Long Point when Captain Martin made the turn, the vessel actually travelled a distance of 13 miles, the difference between 14.5 miles and 1.5 miles. This distance was traversed in approximately 55 minutes, the difference between 12:45 and 1:40. Dividing the 13 miles by the 55 minutes results in a speed between 14 and 15 knots.

12. It should be noted that the Coast Guard data and the data collected by Dr. Flick regarding the swell direction contradicts the swell direction logged by Captain Martin.

conditions were noted to be worsening with wind speed and swell height increasing.

The tempered glass used in the windows of the Catalina Countess had previously been, and apparently continues to be, approved by the Coast Guard. The Coast Guard Final Report reflects that six weeks prior to the incident, the vessel had successfully passed inspection[13], except for the issuance of four Notices of Deficiencies. These notices required the operators of the Countess, Catalina Cruises, to accomplish four tasks:

1) to provide securing device for MSD overboard discharge valve;

2) to provide operating instruction and schematic for fixed CO2 extinguishing system;

3) to provide 23 additional adult personal floatation devices and 3 child personal floatation devices; and

4) to clean personal floatation devices prior to storing.

Catalina Cruises had until April 7, 1994 to correct these deficiencies, and they were timely cleared by the Coast Guard.

### Conclusions of Law

■ The liability phase of this trial required Claimants to establish, by a preponderance of the evidence, that Petitioner's actions on Sunday, April 24, 1994 fell below the standard of care required by shipowners, ships, and employees carrying passengers for hire. "[I]t is a settled principle of maritime law that a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew." *Kermarec v. Compagnie Transatlantique*, 358 U.S. 625, 632, 79 S.Ct. 406, 410, 3 L.Ed.2d 550 (1959). Courts following the *Kermarec* case have expanded upon the notion of reasonable care under the circumstances. Differing circumstances necessitate different levels of degree of care. "The extent to which the circumstances surrounding maritime travel are different from those encountered in daily life and involve more danger to the passenger, will determine how high a degree of care is reasonable in each case." *Rainey v. Paquet Cruises, Inc.*, 709 F.2d 169, 172 (2nd Cir.1983); *see also Monteleone v. Bahama Cruise Line, Inc.*, 838 F.2d 63, 65 (2nd Cir.1988).

■ "[I]n some instances reasonable care under the circumstances may be a very high degree of care; in other instances, it may be something less." *Smith v. Southern Gulf Marine Co. No. 2, Inc.*, 791 F.2d 416, 421 (5th Cir.1986). Factors to consider when determining what degree of care is required include, among others, 1) the experience of the crew, 2) the type of carrier involved, 3) the dangers to the passengers peculiar to that type of carrier involved, 4) the carrier's degree of control over the passengers, and 5) the carrier's ability to take precautions against such danger. *Id.* at 421.

*Operation of the Vessel—Negligence*

■ In this case, there is no question that the experience of the crew was quite extensive. Captain Martin had been licensed by the Coast Guard for over thirty years and had traversed the San Pedro Channel approximately 16,000 times in the last 23 years. Mate Denny Dennis had worked for Catalina Cruises since 1977 and had been licensed since 1980. In addition, on April 24, 1994, the Countess operated with three deckhands, one of which was also a licensed master.

However, all of this experience underscores the fact that this crew, perhaps more than any other crew, should have been aware that crossing the San Pedro Channel, given the weather conditions existing on April 24,

---

13. Vessels carrying seven or more passengers that are certified by the Coast Guard must submit to an annual inspection so that they can obtain a Certificate. Vessels are certified for a particular route and for a particular purpose. The Certificate of Inspection includes 1) a description of the vessel, 2) the route the vessel may travel, 3) the minimum manning requirements, 4) the major lifesaving equipment on board, 5) the maximum number of passengers and person which may be carried, 6) the name of the owner and operator of the vessel, 7) and such other conditions of operation as deemed necessary by the Officer in Charge, Marine Inspection. *See* 46 CFR § 176.01–5. "The condition of the vessel and its equipment shall be acceptable to the cognizant Officer in Charge, Marine Inspection, as a prerequisite of the certificate of inspection renewal. Such acceptance will be based on the condition as found at the periodic inspection for certification." 46 CFR § 176.01–10(f). A thorough inspection is done of the vessel before this certificate is issued. 46 CFR § 176.05–10, *et seq.*

1994, posed a great deal of risk to the passengers. This risk was one that three other captains, captain of the Catalina King, captain of the Super–X, and captain of the Catalina Express, were not willing to face. The magnified risk necessarily heightened the duty of the crew to attend to the safety and comfort of the passengers.

The crew of the Catalina Countess was certainly able to take precautions to avoid the incident and casualties of that fateful day in April. Like the Catalina King and the Catalina Express, the Catalina Countess could have, and should have, stayed in port. Mate Denny Dennis testified that on the trip back down to Avalon from Toyon Bay where the campers embarked, the wind seemed to be picking up, blowing as hard as 20–25 knots in the lee of the island. This meant that the wind could be as strong as 25–30 knots out in the Channel. Using the Beaufort scale, a scale developed by mariners to correlate wind speed to potential wave heights, this wind speed correlated to a potential wave height of 12 to 18 feet in the Channel. Such sea conditions not only created an uncomfortable ride for the passengers but also put them in a great deal of danger, especially in light of the failure to properly equip the vessel, which will be discussed below.

The incident and casualties also could have been avoided had Captain Martin, like the captain of the Super–X, turned back to Avalon once he realized that the Channel crossing was going to be very rough. Claimants testified that the ride became much rougher once the vessel left the protection of the lee of Catalina Island and that the rolling was amplified in intensity for approximately thirty minutes prior to the large wave that struck and broke the port window. Their testimony clearly indicates that the sea conditions were noticeably deteriorating and that a large size wave should not have come as a surprise to the Captain and the crew.

Moreover, prior to leaving the lee of the island, Mate Dennis communicated with the captain of the Catalina Monarch. Mate Dennis was told that the crossing was miserable, with winds up to 30–35 knots. The Countess should have returned to Avalon before leaving the lee of the island. Had Captain Martin not gone out into the Channel at all, or

had he decided to return to Avalon prior to leaving the protection of the island, the incident could have been avoided. Perhaps the incident was due to the Mate's failure to tell Captain Martin the disturbing news from the Monarch about the increasingly dangerous winds of 30 to 35 knots and the accompanying swells of 12 to 18 feet. In any event, to proceed with this knowledge, even though limited to the Mate by the Mate's failure to give it to the Captain, constitutes negligence, at least by a preponderance of the evidence.

Alternatively, Captain Martin, or the Mate under his command, could have avoided the casualty by reducing the vessel's speed and by altering the course. Captain Martin testified that once he made the turn from Long Point toward Long Beach, he reduced the speed of the vessel to 13 knots, but he did not reduce his speed again until after he was informed of the casualty. Captain Martin further testified that his initial heading after he made the turn was between 010° and 018° magnetic. However, he later testified that his heading was set at 025° because he intended to put the seas on the port quarter so as to obtain a smoother ride.

However, to cover the amount of ocean he did in the amount of time he did, Captain Martin must have been travelling at a speed in excess of 14 knots, very close to the top speed of the vessel. Furthermore, to the extent that the vessel's heading was 010° magnetic, the swells would have been striking the vessel on the beam, as corroborated by the testimony of Mate Dennis. While a vessel in the type of weather conditions existing on April 24, 1994 could not maintain a permanent or fixed heading due to the yawing of the vessel, the crew of the Countess should have known that any pounding the vessel took that caused it to yaw would be amplified by the high speed at which the vessel was moving through the water.

Furthermore, *after* the casualty, Captain Martin reduced speed to 11 knots and altered course to head in a more easterly direction. The ride immediately became smoother and calmer, and the vessel did not roll as much as it had. Captain Martin, upon being questioned whether he had an urgent need to speed to meet the published schedule of the

Countess, testified that he was not a slave to the schedule published by Catalina Cruises because the safety of his passengers was always his number one priority. If this was true, there was no reason that he could not have reduced speed and altered course when he first noticed how the already hazardous conditions of wind, seas, and swells were rapidly deteriorating.

In light of the weather conditions facing the crew of the Countess on April 24, 1994 and in light of the options available on that fateful day, Catalina Cruises, the shipowner, bound by and through the actions or inactions of Captain Martin and his crew, failed to exercise reasonable care under the prevailing time, place, and circumstances in the San Pedro Channel on that day. Because of this negligence, Claimants were forced to suffer through a most stressful experience, which could have vivified a fear for some of drowning, and Claimants should be allowed to attempt to demonstrate, in the damages phase, that this experience caused physical trauma or illness and emotional injuries.

*Equipment for the Voyage—Negligence*

■ Passengers of a vessel are not entitled to the warranty of "seaworthiness" as that term is defined in maritime law. *See Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. at 629, 79 S.Ct. at 409. However, the term "seaworthy" may be used in a generic sense to represent that a vessel is reasonably fit to sail. In this generic sense, passengers are entitled to a voyage on a vessel that is properly equipped to handle the conditions to which that vessel may be subjected and to accomplish the purpose for which the voyage was undertaken.

■ The Catalina Countess is a "T-boat", a small passenger vessel. *See* 46 CFR § 175.05–1. All vessels under 100 tons, whether ocean-going or not, must meet the applicable safety requirements set forth in the Code of Federal Regulations. These specify how vessels in this category must be equipped. Catalina Cruises also prescribed certain safety procedures which mandatorily had to be followed on every excursion of each of its vessels, including the Catalina Countess. While the regulations and the company rules do cover a majority of safety concerns, they are by no means completely exhaustive.

The Countess was built in 1977 and was certified for coast service. This meant that the Coast Guard was satisfied, at the time the Countess was built, that the vessel was reasonably suited to carry passengers along the coast. However, certain conditions existed on board the Countess on Sunday, April 24, 1994 that created definite hazards to unsuspecting passengers. These hazards did not come to the attention of any passenger until they were terrorized by the constant and increasingly violent rolling of the vessel to port, anywhere from 20 to 30 degrees. These hazards were made apparent by the shuddering crash of the huge wave which finally struck the vessel on the beam with a force that shattered the window on the main deck and exploded through the gunwales on the number one weather deck.

Analyzing the situation, the Court concludes that the use of unsecured chairs, while perhaps acceptable in calm weather, was dangerous given the prevailing weather conditions. No announcements were given to the passengers warning them of what should have been a reasonably anticipated danger, namely being seated in unsecured chairs aboard a vessel which was transiting the Channel in rapidly deteriorating weather conditions.

Petitioner relies on the fact that the Coast Guard, just six weeks prior to the casualty, had inspected and certified that the vessel complied with all Coast Guard regulations. Moreover, Petitioner emphasizes that in the course of the twenty years of inspection history for the Countess and her sister ships, the Coast Guard had never indicated that the use of unsecured seating was perilous to passengers nor had there ever been an injury resulting from the use of unsecured seating.

However, simply because the Coast Guard does not deem the use of unsecured seating to be unreasonable does not mean that the use of unsecured seating should exempt Petitioner from liability for injuries that result from the insecurity. The Court concludes that the use of unsecured chairs became an unsafe condition as a result of the strong winds and heavy seas encountered by the Catalina Countess on April 24, 1994. Therefore, passengers who were sitting in these

unsecured chairs should be allowed to prove in the damages phase of this matter that the injuries they sustained aboard the Countess were the cumulative result of Captain Martin deciding to cross the Channel to the mainland that day and the foreseeable swells and waves knocking them out of their unsecured chairs.

Further the Court finds another unsafe condition aboard the Countess resulted from the haphazard stacking of luggage with no visible means to secure any of the luggage to the deck of the vessel. Passengers were required to place their luggage between two parallel red canvases suspended from stainless steel posts. Testimony revealed that occasionally when the amount of luggage was unusually great, the area designated for the luggage was insufficient to hold it, leaving some to spill out onto the deck.

Captain Martin and his crew should have known that the heavy sea conditions would cause the luggage to be tossed about, creating an unreasonable risk for passengers seated on the main deck, especially those seated in unsecured chairs. Failure to secure luggage is another instance of how the Countess was negligently equipped for the voyage on April 24, 1994. Claimants should be allowed to demonstrate a causal link between their injuries and the failure to secure the luggage because such a failure falls below the standard of care Catalina Cruises owed to its fare-paying passengers.

In addition to these deficiencies, Catalina Cruises is also liable for a laundry list of substandard conditions aboard the Countess. The Countess did not have covered metal trash containers as required by 46 CFR § 177.35–1(d).[14] Furthermore, the trash cans that were aboard the Countess were not secured to the deck. This potential hazard, like that of the unsecured chairs, should have been conveyed to the passengers. Therefore, Claimants should also be allowed to demonstrate a causal link, if any exists, between their damages and the unsecured, substandard trash cans.

Testimony at trial also revealed that the Countess had insufficient hand-holds for the passengers to brace themselves.

"Suitable storm rails or hand grabs shall be installed where necessary in all passageways, at deckhouse sides, and at all ladders and hatches where passengers or crew may have normal access." 46 CFR § 177.35–5.

On a day such as April 24, 1994, with visibly bad weather conditions that appeared to be deteriorating, it should have been obvious to the crew of the Countess that any crossing of the San Pedro Channel would cause the boat to be thrown and rolled from side to side up to 20 to 30 degrees on its port side. While Captain Martin may have recommended that passengers remain seated as much as possible, some passengers did not hear this announcement; others, perhaps, did not heed it. The lack of hand-holds, or "hand grabs", in an area of the ship where passengers have normal access is unreasonable. Installation of hand-holds may have kept some passengers from being thrown about when the huge wave that broke the window struck the vessel on the port beam. Safety of the passengers should have been the number one concern of Captain Martin and his crew at all times, in preparation for, as well as during, the voyage.

Another aspect of safety aboard a vessel is the availability and accessibility of effective life jackets in good working order. While those passengers who heard the safety announcements may have been aware of the location of the life jackets and other life saving equipment, many passengers did not hear any such announcements. The signs that directed passengers to the location of the life jackets were small and did not grab their attention right away. Small print on the under-side of bench seats indicated that life jackets were located therein. But, unless passengers found themselves lying on the deck facing the stenciled signs, they could not have known where to locate the safety

---

**14.** It is interesting to note that the Certificate of Inspection for the Countess was issued without any mention of the non-conforming trash cans. While this fact alone may seem insignificant, taken with the other circumstances, it does cast doubt upon the thoroughness of the Coast Guard's inspection, especially in light of the testimony that the Coast Guard conducts thorough inspections and will not issue a certificate unless the vessel and its operator are in compliance with all of the regulations.

devices. Moreover, the Court was startled by the testimony of Claimant Lisa Bolton who said that after the wave struck and knocked her out of her seat, she looked in one of the boxes for a life jacket, but it was empty.

Of course, the availability of life jackets is useless if passengers are not knowledgeable about how to put on and use such safety devices. On February 1, 1993, Catalina Cruises' Port Captain issued a directive that, while a vessel's captain, including Captain Martin, is making his safety announcement upon departing a port, the deckhands must demonstrate the proper procedure for donning life jackets. This directive is much more specific than the Coast Guard regulation, 46 CFR § 185.25–1(d), which requires that a captain of a vessel should, before getting underway, insure that:

> "suitable public announcements, instructive placards or both are provided in a manner which affords all passengers the opportunity to become acquainted with: (1) Stowage location of life preservers; (2) Proper method of donning and adjusting life preservers of the type(s) carried on the vessel; (3) The type and location of all life-saving devices carried on the vessel; and (4) The location and contents of the "Emergency Checkoff List required by § 185.25–5."

Considering that many of the passengers did not or could not hear the announcements made, the announcements obviously were not "suitable." Moreover, the placards that purported to demonstrate how to don life jackets were so relatively small that they were obviously not provided "in a manner which affords all passengers the opportunity to become acquainted with" the safety features of the vessel. It follows that Petitioner did not even comply with the basic regulations enacted by the Coast Guard.

Nor was the Countess in compliance with the rules of Catalina Cruises, the owner of the vessel. All the testimony elicited at trial indicated that no deckhand demonstrated how to don life jackets. Even if passengers had been able to locate the life jackets, the Court necessarily concludes that the crew of the Catalina Countess disobeyed the Port Captain's directive by not demonstrating the donning of life jackets. To insure the safety and peace of minds of the passengers, the crew should have adopted an attitude of hope for the best, but prepare for the worst.[15] Such preparations would involve demonstrating how to effectively use the life jackets. There was no evidence adduced at the trial that this was done. The safety of the passengers was not the foremost concern of the crew of the Countess, and Claimants should be allowed to demonstrate in the damage phase what causal link exists, if any, between their injuries and the failure of the crew to properly instruct all of the passengers as to the availability and use of life jackets.

### Conclusion

As Claimants amply demonstrated at trial, Catalina Cruises was negligent in each of the following respects: 1) Operating the Countess on April 24, 1994 by taking the vessel out in weather that posed a great risk to the passengers; 2) Failing to return to the safest harbor when the Captain noticed that the weather was rapidly deteriorating; and 3) Failing to keep the Countess properly equipped for the foreseeable type of crossing experienced by the passengers aboard the Countess on April 24.

Therefore, the owner, Catalina Cruises, should be, and hereby is, held to have acted in a negligent manner with respect to the 32 Claimants. It is now up to Claimants to establish that the negligent actions of the Petitioner, owner, through the Captain and Mate of the Countess, were the proximate cause of any injuries suffered by the Claimants.

### ORDER

For the foregoing reasons, Petitioner, Catalina Cruises, is hereby found to be liable for failing to exercise reasonable care towards the Claimants, fare-paying passengers lawfully aboard the vessel. Claimants, at the next phase of the trial, must demonstrate the nature and the extent of their injuries and

---

**15.** This attitude is one exhibited by airline operators. While it is the hope of all passengers aboard an airplane that nothing disastrous will occur, there is something very comforting in the fact that the flight attendants demonstrate equipment to be used in case of an emergency and show the passengers, by words and actions, all the emergency procedures.

resultant damages, if any, and that they were proximately caused by the negligence of the Petitioner.

LET PARTIAL JUDGMENT FOR LIABILITY BE ENTERED IN AND AS PART OF THE FINAL JUDGMENT.